**UNITED STATES of America, Appellant,**

v.

**Richard KELLY.**

**No. 82–1660.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 11, 1983.

Decided May 10, 1983.

As Amended July 6, 1983.

Michael W. Farrell, Asst. U.S. Atty., with whom Stanley S. Harris, U.S. Atty., Roger

M. Adelman and Stephen R. Spivack, Asst. U.S. Attys., were on the brief, for appellant. John A. Terry, Asst. U.S. Atty. at the time the brief was filed, also entered an appearance for appellant.

Anthony S. Battaglia, with whom Stephen J. Wein was on the brief, for appellee.

Before ROBINSON, Chief Judge, MacKINNON and GINSBURG, Circuit Judges.

Opinion Per Curiam.

Separate Opinion filed by Circuit Judge MacKINNON.

Separate Opinion filed by Circuit Judge GINSBURG.

PER CURIAM:

Judge MacKinnon files an opinion in Parts I, II, III(A) and IV of which Chief Judge Robinson concurs. Judge Ginsburg files an opinion in which Chief Judge Robinson concurs. Thus Parts I, II, III(A) and IV of Judge MacKinnon's opinion together with Judge Ginsburg's opinion constitute the opinion of the court. The judgment appealed from is reversed, and the case is remanded to the District Court with instructions to reinstate the indictment and the verdict of the jury, and for further proceedings.

MacKINNON, Circuit Judge.

The Federal Bureau of Investigation, in an effort to recover stolen art and securities, set up an undercover operation—"Abscam"—designed to catch red-handed those who dealt in such items. In due time the FBI was led to alter the character of the operation to target some government corruption. Thereafter several highly placed local, state and national government officials were indicted and convicted. This appeal involves one United States Congressman.

On January 8, 1980, Congressman Richard Kelly accepted $25,000 from an agent of the FBI who was posing as a representative of two wealthy Arabs as part of the FBI's elaborate Abscam investigation. In return, Kelly agreed to use his position in Congress to assist the Arabs to become permanent residents of the United States. Unbeknownst to Kelly, the FBI recorded the entire illegal transaction on video tape.

On the basis of this and other evidence, Kelly and two other individuals, Eugene Ciuzio and Stanley Weisz, were charged with conspiracy to commit bribery, in violation of 18 U.S.C. § 371 (1976), bribery, in violation of 18 U.S.C. § 201(c) (1976), and interstate travel to commit bribery, in violation of 18 U.S.C. § 1952 (1976). A jury found each defendant guilty on all counts. However, the district court granted Kelly's motion to dismiss the indictment, entering a judgment of acquittal in his favor, because it concluded that the FBI's actions in furtherance of Abscam were so outrageous that prosecution of Kelly was barred by principles of due process. *United States v. Kelly,* 539 F.Supp. 363, 370–77 (D.D.C. 1982).[1]

Abscam was indeed an elaborate hoax, created by the FBI with the assistance of a convicted confidence man to ferret out corrupt public officials. Nevertheless, we conclude that the government's conduct in Abscam did not reach that "demonstrable level of outrageousness" which would bar prosecution of the corrupt officials that were uncovered, particularly given the difficulties inherent in their detection. *Hampton v. United States,* 425 U.S. 484, 495 n. 7, 96 S.Ct. 1646, 1653 n. 7, 48 L.Ed.2d 113 (1976) (Powell, J., concurring). Accordingly, we reverse the district court and remand with instructions to reinstate the indictment and the jury's verdict.

I. FACTS

A. *The Abscam Investigation*

In the spring of 1978, the FBI's Long Island office began an undercover investigation with the initial goal of recovering

---

1. The district court granted a new trial to Ciuzio and Weisz. *United States v. Kelly, supra,* 539 F.Supp. at 377–78. Both were convicted on all counts at their second trial.

stolen art and securities.[2] The code name for this investigation was "Abscam," a name derived from Abdul Enterprises, the name of a fictitious FBI-created organization which ostensibly represented two Arabs of considerable wealth interested in "investing" in the United States.[3] Convicted confidence man Melvin Weinberg was enlisted by the FBI to assist in the creation and operation of Abscam.[4] Weinberg played the role of financial advisor to Abdul Enterprises, while FBI agents "held" other positions in that organization.[5] Beginning in January 1979, Anthony Amoroso, a special agent for the FBI, assumed the role of president of Abdul Enterprises.[6]

Initially, the FBI made it known on the streets that Abdul Enterprises had money to invest and waited to be approached with proposals.[7] Abdul Enterprises turned away individuals offering legitimate transactions, but maintained contact with those suggesting illegal activity. In November 1978 Abdul Enterprises was approached by two businessmen, William Rosenberg and William Eden, concerning the possibility of financing certain equipment to be leased to the City of Camden, New Jersey. It appeared that the transaction would require payment of a bribe to Angelo Errichetti, then Mayor of Camden.[8] Thereafter the focus of Abscam shifted to political corruption and organized crime.[9]

On July 26, 1979, Mayor Errichetti, who had since been introduced to the Abscam agents by Eden and Rosenberg,[10] and Howard Criden, a Philadelphia lawyer and associate of Errichetti, met with Weinberg and Amoroso on a yacht in Florida to discuss financing for a proposed casino that a client of Criden wished to build. During the day Amoroso and Errichetti discussed the problems that might face the wealthy Arabs who controlled Abdul Enterprises should an Iranian-type revolution occur in their country and they sought to come to the United States as permanent residents. Amoroso enlisted Errichetti's assistance in obtaining the "cooperation" of public officials and suggested that money would be no problem. Errichetti and Criden agreed and, on August 22, 1979, introduced the Abscam

---

2. Trial Transcript (Tr.) at 1442–43, 1559–60, 3361–62, 3552.

3. Tr. at 3589–91.

4. From 1968 until 1976, Weinberg had operated an illegitimate business known as London Investors. Weinberg, claiming to represent wealthy investors, promised to arrange loans in exchange for "loan origination fees" *paid in advance.* Tr. at 1554–55, 1665–69. Of course, Weinberg never arranged the loans, but rather absconded with the fees.

Weinberg was arrested by the FBI in 1976 for his London Investors activities and, in 1977, pled guilty to mail and wire fraud charges brought in the United States District Court for the Western District of Pennsylvania. Tr. at 1555, 1669–71. In exchange for his cooperation in four organized crime cases, the FBI interceded on Weinberg's behalf before the district court. As a result, Weinberg was sentenced to three years probation and permitted to return to New York to assist the FBI. Tr. at 1555–57, 1673–74, 3546–51. Thereafter, Weinberg assisted the FBI in Abscam, which was modeled after his successful London Investors scheme. Tr. at 1690–93, 3552, 3589–91. Beginning in August 1978, Weinberg received $1000 per month—raised in 1979 to $3000 per month—for his Abscam work. Tr. at 1028–30, 3546–51.

5. Tr. at 3374–75.

6. Tr. at 1021–22, 3444–45.

7. Tr. at 1690–92. As Weinberg explained, "we had a big honey pot and all the flies came to it." Tr. at 1691.

8. Tr. at 1709–14, 3373–78.

9. Tr. at 1442–43, 3458–59. In December 1978 Mayor Errichetti met with the representatives of Abdul Enterprises and boasted that "he could control" Atlantic City. He later indicated that a bribe of $300,000 to $400,000 would guarantee a gambling license. Tr. at 1715, 3596–98. Errichetti ultimately *led Abscam* to a number of *other corrupt public officials. See United States v. Myers,* 692 F.2d 823 (2d Cir. 1982); *United States v. Jannotti,* 673 F.2d 578 (3d Cir.) (en banc), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982). In March 1979 Abscam uncovered corruption in the Immigration and Naturalization Service. Tr. at 1252–53. *See United States v. Alexandro,* 675 F.2d 34 (2d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 78, 74 L.Ed.2d 75 (1982).

10. Tr. at 1209, 1443–44, 3458–59, 3597–98.

agents to Congressman Michael Myers, who accepted $50,000 in exchange for his promise to assist the wealthy Arabs.[11] Thus was introduced the "asylum scenario"—whereby members of Congress were paid bribes to ensure that they would introduce private immigration legislation on behalf of the wealthy Arabs if and when necessary— which ultimately caught Kelly.[12]

## B. *Abscam's Introduction to Kelly*

On September 10, 1979, Weinberg met with Rosenberg and sought his aid in locating politicians willing to assist his Arab employers to become permanent residents of the United States.[13] Weinberg outlined the assistance required, indicating that the Arabs would pay $25,000 to a member of the House of Representatives and $50,000 to a member of the Senate for their promise of future assistance. Weinberg suggested that Amoroso would "talk one and one and make the guy safe" at the time of the payoff.[14] In October 1979 Rosenberg related the proposal to a business associate and accountant, Stanley Weisz. Rosenberg told Weisz that the Arabs needed immigration

assistance and that Weisz would receive a fee for the proper introductions.[15]

On November 20, 1979, Weisz, while on vacation in Boynton Beach, Florida, met with his longtime business associate, Eugene Ciuzio.[16] During their conversation, Weisz related the Arabs' need for immigration assistance to Ciuzio. Ciuzio replied that he knew a congressman who might be willing to help the Arabs and indicated he would check with him and get back to Weisz.[17] In fact, Ciuzio had never discussed immigration matters with Kelly, having first met Kelly on October 1, 1979, in an Orlando restaurant.[18]

Ciuzio promptly arranged to meet with Kelly at the Tampa airport on November 23, 1979. At that meeting Ciuzio told Kelly that he had some Arab clients with immigration difficulties and asked Kelly if he could help them. Kelly indicated that his office handled such matters routinely and that he would be glad to assist the Arabs, particularly since Ciuzio indicated they might invest in his district.[19] Ciuzio informed Kelly that he—Ciuzio—would receive a large fee if Kelly helped the Arabs;

11. *United States v. Myers,* 527 F.Supp. 1206, 1210–12 (E.D.N.Y.1981), *aff'd,* 692 F.2d 823 (2d Cir.1982); Tr. at 1748–51, 3463–68; Due Process Transcript (Due Process Tr.) at 180–83.

12. There is some dispute as to who created the asylum scenario. The district court concluded that it "was conceived—lock, stock, and barrel—by Weinberg and made its first appearance on July 14, 1979 . . . ." *United States v. Kelly, supra,* 539 F.Supp. at 366 & n. 10. *See* Joint Appendix at 344, 354–67. The government, on the other hand, asserts that Amoroso conceived of the asylum scenario on July 26, 1979, as he cruised by former Nicaraguan dictator Somoza's yacht. Due Process Tr. at 180–81. Insofar as is relevant to this case, the asylum scenario was the suggestion of a government agent—either Amoroso or Weinberg—and not of Kelly.

13. Transcript of Meeting of Sept. 10, 1979, at 1–5, 7; Tr. at 890–92, 1088–92, 1443–44, 1565–66, 1570–71, 1740–44. Although Amoroso and Weinberg suggested that Rosenberg "reach out" to politicians as early as August 24, 1979, this was in the context of their request for assistance in obtaining New York gambling licenses. Transcript of Meeting of Aug. 24, 1979, at 7–8; Tr. at 1078–80B. The asylum

scenario was not mentioned to Rosenberg at the August meeting.

14. Transcript of Meeting of Sept. 10, 1979, at 2–3, 7; Tr. at 891–92, 1090–92, 1570–71.

15. Tr. at 1488–89, 3851–53, 3953–55. Although Rosenberg introduced Weisz to Amoroso and Weinberg at a meeting on September 12, 1979, the asylum scenario was not discussed with Weisz at that time. Tr. at 886–87, 1569–70, 3942–43.

16. Ciuzio had referred a friend to Weisz for assistance in a federal tax matter. The purpose of the meeting was to provide Weisz with the details of that dispute. Tr. at 3855–63.

17. Tr. at 1488–89, 3855–63, 3958–60, 4106–07.

18. Tr. at 1995–97, 2022–24, 2610–15, 4099–102.

19. Tr. at 2656–61, 2844–45, 4109–11, 4198–99. Kelly testified that immigration problems were "handled as a staff matter." Tr. at 2661. Kelly had "no recollection or record that [he] was involved in any [immigration] cases." Tr. at 2660–61.

Kelly told Ciuzio that the fee would cause no difficulties.[20] Ciuzio promptly called Weisz from the Tampa airport and indicated that Kelly would be happy to help the Arabs.[21]

In mid-December 1979 Weisz informed Rosenberg of Ciuzio's friendship with a Florida congressman who was willing to help the Arabs.[22] On December 16, 1979, Rosenberg called Weinberg and told him that he had a "candidate" who would assist with the Arabs' immigration problems. Rosenberg indicated that the individual was a congressman from Florida, that he wanted $250,000, and that payment would have to be on "an escrow basis." Weinberg suggested that the Congressman be paid $25,000 down, with the balance paid when legislation was required. Rosenberg agreed to set up a meeting with the Congressman at Abdul Enterprises' Washington, D.C., townhouse on January 8, 1980.[23] Rosenberg called Weisz and told him of Weinberg's positive response. Weisz gave Rosenberg Ciuzio's telephone number and agreed to call Ciuzio to ask him to contact Weinberg.[24] On December 17, 1979, Rosenberg again called Weinberg and explained that Weinberg would be contacted by "a fellow by the name of Gino [Ciuzio] who will handle all the arrangements for you and who will give you the person."[25]

On December 19, 1979, Amoroso and Weinberg met with Ciuzio in Hollywood, Florida, and explained the assistance that would be expected of the Congressman.[26] *Ciuzio indicated that the individual was Congressman Richard Kelly and intimated that he and Kelly had had previous dealings of a similar nature.*[27] Ciuzio suggested that he told Kelly of the offer and claimed that Kelly left the arrangements to him. Ciuzio opposed direct payment to Kelly and suggested that the money instead be escrowed through Weisz.[28] Amoroso assured him that a private meeting between Amoroso and Kelly would protect the Congressman, and that the wealthy Arabs would invest in Kelly's district to provide an explanation for Kelly's assistance.[29] Weinberg made it clear that the meeting and payment of $25,000 was to assure the Arabs that Kelly

> got the money [and] when we're ready to move that he is gonna be with us.[30]

Ciuzio agreed to "lay out the story" for Kelly.[31]

On December 21, 1979, Ciuzio telephoned Weinberg and suggested a January 8, 1980, meeting with Kelly. Ciuzio reiterated that he and Weisz did not want to have the money handed directly to the Congressman.[32] Weinberg insisted that Kelly be directly involved in the transaction, but indicated that

> he's pregnant, ya understand. *He's already takin' money* so we're married and thats all. *Id.* at 39 (emphasis added).

---

**20.** Tr. at 2844–45, 4109–11, 4198–99. Kelly admitted that he also discussed the amount of his indebtedness with Ciuzio. Tr. at 2844–45.

**21.** Tr. at 3866–67, 3958–60, 4113–14.

**22.** Tr. at 3869–72.

**23.** Transcript of Telephone Call of Dec. 16, 1979, at 5–9, 12–13.

**24.** Tr. at 3869–72.

**25.** Transcript of Telephone Call of Dec. 17, 1979, at 1.

**26.** Transcript of Meeting of Dec. 19, 1979, at 11–12, 14, 22.

**27.** *Id.* at 16, 38–39. Referring to Kelly, Ciuzio asserted:

> Not that I'll ever use it on em, of course, but I'm just saying uh umm. *He's in.* Ya know, we were holdin' hands for a long time, now

**28.** *Id.* at 16, 18–19, 26, 30, 34–35.

**29.** *Id.* at 18–19, 34–35.

**30.** *Id.* at 33.

**31.** *Id.*

**32.** Transcript of Telephone Call of Dec. 21, 1979, at 2–4, 9–10. Earlier, Ciuzio told Weinberg that he asked Kelly to call him from a public phone booth "that would be safe," rather than from his congressional office, to discuss the transaction. Kelly did, in fact, call Ciuzio from a phone booth located a few blocks from his home in Virginia. Transcript of Telephone Call of Dec. 20, 1979, at 2; Tr. at 2685–86, 4265–70.

[a]ll he [Amoroso] wants the Congressman [to do] is to tell him what he's gonna do for him for the money.[33]

Ciuzio agreed, but requested that they use "the right script, nice and soft." [34]

On December 23, 1979, Ciuzio met Kelly at a restaurant in Alexandria, Virginia, and explained the proposal. *Kelly testified* that Ciuzio told him that

> there were two Arabs that were going to come into the United States and there was concern that they would have an immigration problem, and that if they did, they wanted to be assured that they would have some assistance from a person with some authority and that in this connection, a representative of these Arabs was prepared to pay a half a million dollars for this assistance. And that the arrangements would be that the two Arabs may not come into the country, but that their representatives wanted to have a meeting.
>
> They wanted to be sure that in the event they needed something, that they would have established a relationship, a contact that would cause this assistance to be available. And in this connection, that they would pay $25,000 just as earnest money. . . . *I would receive $25,000 just for going to the meeting,* and nothing would be expected of me, and then if at a later time there developed that there would be some need, then I would be expected to render this assistance and that *I would receive at that time an additional $100,000,* and the rest of the money was to be paid to [Ciuzio, Rosenberg, and Weisz] . . . .[35]

Ciuzio also told Kelly of the Arabs' intention of investing substantial sums in the districts of cooperative congressmen.[36]

Kelly agreed to go to the meeting and give his assurances that he would help the Arabs, despite the fact that Ciuzio, Rosenberg, and Weisz would be paid as a result. However, Kelly testified that he refused to accept money for doing so:

> I would be glad to do it. But as far as my receiving any money for doing it, I just simply didn't want to do that. There wasn't any need to.
>
> There was no problem. It was a standard procedure and that I would not accept any money . . . . I said, . . . I will do that. You can depend on me, I will go to the [h]ouse and we will give these assurances to the representatives . . . .
>
> I am glad to do this as a favor to you. If you want to do something for me . . . I have got some real estate that I want to sell and perhaps you can help me find a buyer for that.[37]

## C. *Abscam's Payoff to Kelly*

Shortly after 10:00 p.m. on January 8, 1980, Kelly, Ciuzio, Rosenberg, and Weisz arrived at Abdul Enterprises' Washington, D.C., townhouse to meet with Weinberg and Amoroso. Initially Weinberg met with Ciuzio, who vigorously sought to disuade Amoroso from attempting to bribe Kelly directly.[38] The two ultimately agreed that Kelly would acknowledge that the money was in exchange for his agreement to assist the Arabs, but that Ciuzio would actually take the money from the meeting:

> WEINBERG: You can be in with him, all right?

---

**33.** Transcript of Telephone Call of Dec. 21, 1979, at 13.

**34.** *Id.*

**35.** Tr. at 2663–64 (emphasis added). Ciuzio denied that he told Kelly of the proposal at their meeting, although his testimony was equivocal. Tr. at 4126–31, 4302–05.

**36.** Tr. at 2664–65.

**37.** Tr. at 2665–66.

**38.** Transcript of Meeting of Jan. 8, 1980, at 1–11. Ciuzio said, "Don't hand him no f___ing money, don't talk money, tell him what the problem is . . . ." *Id.* at 3. Later Ciuzio and Weinberg had the following exchange:

> WEINBERG: Well, he knows he's getting money right?
>
> CIUZIO: He ain't taking no f___ing money in his hand.
>
> WEINBERG: All right, you'll take it . . .
>
> CIUZIO: All right.
>
> WEINBERG: he'll hand it to you.

*Id.* at 4.

CIUZIO: Well I think I should be here to, ahh steer the f___ing thing . . .

WEINBERG: Let him, let, just put the money on the table and say here, take it . . . here Congressman, here's the twenty-five thousand and that's it, you pick it up.

CIUZIO: Go along with that, he knows the answers too.

WEINBERG: All right, so . . .

CIUZIO: I rehearsed with him.[39]

After this conversation Kelly and Amoroso met privately. Amoroso explained the Arabs' immigration difficulties and their willingness to pay to have "friends" in Congress when required. He also indicated that the Arabs would invest in their "friends'" districts in order to protect them from pressure.[40] Kelly's response revealed that he was aware of the purpose for the investments:

AMOROSO: Now I realize that ahh there's a possibility that ahh if, if you were to introduce something like this, that ahh, people would ask, well why is he doing it, ya known, well what's the reason, now . . .

KELLY: I've got the reason.

AMOROSO: OK, what . . . would that be . . . investing?

KELLY: Sure.[41]

Kelly agreed to assist the Arabs, and, as recorded on the video tape, indicated that Amoroso's arrangement with Ciuzio was fine:

All of this stuff that you've been talking about . . . *I don't know anything about that, I'm not involved with it* . . . Gino and these guys are my friend[s] . . . what you said makes a lot of sense to me . . . I'm gonna stick with ya . . . *and you can put me out there on the hill, and when you come back in the morning, I'll still be there* . . . . So this . . . will be helpful to me and . . . maybe . . . down the road

sometime, you can do me a favor. *But in the meantime, whatever these guys are doing is all right, but I got no part in that* . . . . In other words, . . . your arrangement with these people is . . . all fine. . . . [Y]ou have my assurance that what you have told me here, sounds like a good thing and . . . I will . . . stick by these people.[42]

After Amoroso received a call from Assistant United States Attorney Jacobs who was monitoring the meeting and who thought Kelly was being "cute," and after Kelly conferred with Ciuzio,[43] Amoroso sought to clarify Kelly's position. Kelly made it clear that he wanted the money given to Ciuzio:

KELLY: [Y]ou and I gotta . . . learn to talk to each other.

AMOROSO: Well I know . . .

KELLY: [D]on't stumble around, jump in there . . .

AMOROSO: Jump in there and give it to you?

KELLY: Sure.

AMOROSO: Ok. I was under the impression . . . when this thing was set up . . . that I was gonna give you something . . . tonight . . .

KELLY: Yeah.

AMOROSO: Ok, and that the rest was gonna come . . .

KELLY: Yeah.

AMOROSO: when you introduce that.

KELLY: That's right.

AMOROSO: Ok, is that, is that still . . .

KELLY: Yeah. Here's . . . what the thing is. Umm ahh just simply deal with Gino [Ciuzio] about it.

AMOROSO: Ok. You want me to give him the money . . . here?

KELLY: Sure.[44]

However, when Amoroso indicated that all of the money was intended to go to Kelly,

---

39. *Id.* at 10.

40. *Id.* at 11–13.

41. *Id.* at 12–13.

42. *Id.* at 16 (emphasis added).

43. Tr. at 1104–09, 1173–76, 1181–82, 1392–93, 1412–14, 2207–08, 2870–72, 4145–47.

44. Transcript of Meeting of Jan. 8, 1980, at 22–23.

and that Ciuzio would be separately compensated, Kelly was confused:

> I understood that what you were talking about was ... all there was as far as Tony [sic, should be Ciuzio] was concerned and so as far as I'm concerned, he takes that.... [B]ut I see I didn't know ... about this other arrangement.... It's ... all right but I didn't know about that. So lets talk about it some.[45]

Amoroso explained that he thought that giving the money directly to Kelly would avoid witnesses, thus protecting him. Kelly agreed:

> AMOROSO: I thought that the best way of doing it was ... a one on one between you and I. Now to me that sounds like ... if you're looking for security ... the best way of doing it.
> KELLY: I think so too.[46]

Amoroso then gave Kelly $25,000 in cash and Kelly stuffed the money into the pockets of his suit.[47]

## II. THE DISTRICT COURT DECISION

In ruling on Kelly's motion to dismiss the indictment and to set aside the verdict of the jury, the district court acknowledged the need for undercover investigative techniques to detect "diabolical criminal conduct so sophisticated as to be nearly impossible to detect," but concluded that

> as Abscam affected Kelly, it was not the type of carefully devised and supervised covert operation generally accepted by the courts. In many respects it differed sharply from traditionally accepted types of operations.

*United States v. Kelly, supra,* 539 F.Supp. at 371. The district court complained that the asylum scenario was not triggered by any suspicion of corruption in government and that, unlike ordinary, passive sting operations, it utilized legal and illegal bait promoted by a "recruiting agent" "to persuade the Congressman to become a sting patron." *Id.* The district court concluded that the sole purpose of the asylum scenario

was to test the virtue of members of Congress. *Id.* at 373.

The district court admitted its personal distaste for the concept of law enforcement agencies testing the virtue of congressmen, but held, assuming that such activities were proper,

> the application of the testing procedures in this case patently exceeds the outer limits of any concept of fundamental fairness.
>
> The litmus test—or temptation—should be one which the individual is likely to encounter in the ordinary course. To offer any other type of temptation does not serve the function of preventing crime by apprehending those who, when faced with actual opportunity, would become criminals. Instead, it creates a whole new type of crime that would not exist but for the government's actions.
>
> When improper proposals are rejected in these virtue-testing ventures, the guinea pig should be left alone. *In ordinary real life situations, anyone who would seek to corrupt a Congressman would certainly not continue to press in the face of a rejection for fear of being reported and arrested.* The FBI of course had no such restraints in this case.

*Id.* at 373–74 (emphasis added) (footnote omitted).

The district court found that Kelly rejected the bribe offer at his meeting with Ciuzio on December 23, that Ciuzio informed the Abscam agents of that fact at the townhouse on January 8, and that Kelly initially rejected the bribe in his meeting with Amoroso. *Id.* at 374. Accordingly, the district court concluded

> that in the circumstances of this case, any further pursuit and pressure on the part of government agents was nothing short of outrageous.... If the government had no knowledge of Kelly doing anything wrong up to his rejection of illicit money, its continuing role as the third man in a fight between his conscience

---

**45.** *Id.* at 24–26.

**46.** *Id.* at 26–27.

**47.** *Id.* at 28–30.

and temptation rises above the level of mere offensiveness to that of being "outrageous." *No concept of fundamental fairness can accomodate what happened to Kelly in this case.*

*Id.* at 376 (emphasis added).

## III. ANALYSIS

### A. *The Due Process Defense*

■ The district court concluded that the FBI's conduct in furtherance of Abscam was so outrageous that prosecution of Kelly was barred by principles of due process.[48] The Supreme Court has recognized that there may be situations

in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction . . . .

*United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–1643, 36 L.Ed.2d 366 (1973).[49] More recently, a divided Court reaffirmed that due process principles might foreclose prosecution of a predisposed defendant if the government was excessively involved in his criminal activity. *Hamp-*

ton v. United States, supra, 425 U.S. at 495, 497, 96 S.Ct. at 1652, 1653 (Powell, J., concurring) (Brennan, J., dissenting). However, Justice Powell, in his critical concurring opinion, stated:

I emphasize that the cases, *if any,* in which proof of predisposition is not dispositive will be rare. Police overinvolvement in crime would have to reach a *demonstrable level of outrageousness* before it could bar conviction. *This would be especially difficult to show with respect to* contraband *offenses, which are so difficult to detect in the absence of undercover Government involvement* . . . . [Law] [e]nforcement officials therefore must be allowed flexibility adequate to counter effectively such criminal activity.

*Id.* at 495 n. 7, 96 S.Ct. at 1653 n. 7 (Powell, J., concurring) (emphasis added).

Our task in this case, therefore, is to assess whether the FBI's conduct in Abscam reached a "demonstrable level of outrageousness," while keeping in mind the difficulties inherent in detecting corrupt public officials. *Id.; United States v. Rus-*

---

48. Kelly contends that the district court also held that he was entrapped as a matter of law. Brief for Appellee at 74–78. Although the district court did submit Kelly's entrapment defense to the jury, Tr. at 4929–34, we do not interpret Judge Bryant's decision to hold that Kelly was entrapped as a matter of law. Rather, our review of the record reveals that the district court in fact thought that Kelly had not aggressively pursued his claim of entrapment. Tr. at 3294–95, 4417; Due Process Tr. at 70–71, 216. Judge Bryant recognized that it would be difficult for a public official such as Kelly to pursue an entrapment defense:

I know its tough for a man to come in and say, "Well, I got into a situation and I was overborne with temptation and I succumbed." I know it's tough for him to say that. This man is in public life and that kind of thing.

Tr. at 3295. *See also United States v. Kelly, supra,* 539 F.Supp. at 377 n. 58. Furthermore, the mere fact that a judgment of acquittal was entered in Kelly's favor does not indicate that the district court ruled Kelly was entrapped as a matter of law. Kelly's own request for a judgment of acquittal on due process grounds belies any such assertion. Tr. at 1855A–55F; Due Process Tr. at 74. Accordingly, there is no need to address Kelly's contention that the dou-

ble jeopardy clause of the Fifth Amendment prohibits the government's appeal of the post-verdict, judgment of acquittal in this case. *See generally United States v. DiFrancesco,* 449 U.S. 117, 130, 101 S.Ct. 426, 433, 66 L.Ed.2d 328 (1980); *United States v. Singleton,* 702 F.2d 1159 at 1161–1162 (D.C.Cir.1983).

49. The Court cited *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), apparently as an example of the type of outrageous government activity which would bar prosecution under principles of due process. In that case, the Court found that actions of police officers, who broke into the bedroom of the defendant, attempted to pull drug capsules from his throat, and, finally, forcibly pumped his stomach to retrieve the capsules, violated due process. *Id.* at 166, 172, 72 S.Ct. at 206, 209. The Second Circuit has read this citation to indicate that due process will bar a prosecution only if the government's conduct directly invades some personal right of the defendant. *United States v. Alexandro,* 675 F.2d 34, 40 (2d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 78, 74 L.Ed.2d 75 (1982); *Archer v. Commissioner of Corrections,* 646 F.2d 44, 46–47 (2d Cir.), *cert. denied,* 454 U.S. 851, 102 S.Ct. 291, 70 L.Ed.2d 141 (1981).

*sell, supra,* 411 U.S. àt 432, 93 S.Ct. at 1643. Measured against this standard, the FBI's conduct did not violate due process.

## B.  *Abscam*

Abscam was indeed an elaborate hoax, involving a fictitious, FBI-created corporation purportedly representing Arabs of enormous wealth, as well as the limousines, yachts, and lavishly appointed residences necessary to make the hoax believable. Yet stripped of these trappings of wealth, Abscam was no more than an "opportunity for the commission of crime by those willing to do so." *United States v. Myers,* 692 F.2d 823, 837 (2d Cir.1982).  Amoroso and Weinberg let it be known that they would pay substantial sums of money to congressmen willing to promise to assist the wealthy Arabs with their immigration difficulties. Thereafter, the FBI operatives simply waited for the grapevine to work and to see who appeared to take bribes.  No congressmen were targeted for investigation; rather, Abscam pursued all who were brought to the operation by the grapevine.[50]  In essence, then, Abscam was *not* significantly different from an undercover drug or fencing operation offering to buy from all who appear at its door.[51]  Instead of buying

**50.**  Tr. at 1096–98, 1237–39, 1255–57, 3656–58, 3726–28.  However, not all officials brought to Abscam were offered bribes.  The Abscam operatives recognized that they had no control over the representations made by intermediaries such as Ciuzio, Rosenberg, and Weisz.  Tr. at 1237–39, 3656–58.  Accordingly, the FBI *always* discussed the asylum scenario with the officials prior to the offer of a bribe.  Tr. at 3726–28.  That was certainly the case with Kelly; Amoroso carefully discussed the details of the asylum scenario with Kelly *before* any bribe money was paid.  *See* discussion at 28 *infra.*  In one instance, where this discussion revealed that the official was unaware of the corrupt nature of the proposal, the FBI terminated the meeting.  Tr. at 1422–25, 3288–91.

**51.**  The district court concluded that Abscam was unlike ordinary, "passive" undercover operations because it used "recruiting agents" to spread the word that bribes were available. *United States v. Kelly, supra,* 539 F.Supp. at 371.  I seriously doubt that the government would establish an undercover drug or fencing operation without spreading the word, through informants and criminal elements (labeled "recruiting agents" by the district court), that its services were available. The Abscam investigators did no more.

My colleagues term Abscam an extraordinary operation.  *Infra,* at 1474–1476.  It was extraordinary only in the positions of some of the individuals involved and in the intangible nature of the "commodity" purchased.  Otherwise, it is strikingly similar to ordinary undercover operations.  To conclude otherwise suggests lack of familiarity with changes in the law enforcement activities of the FBI since the death of J. Edgar Hoover in 1972.  *Final Report of the Select Committee to Study Undercover Activities of Components of the Department of Justice,* S.Rep. No. 682, 97th Cong., 2d Sess. 39 (1982).  Hoover was an advocate of keeping FBI activities "of an open character not in any manner subject to criticism." *Id.* at 35.  He resisted efforts to get the FBI into drug enforcement because it would have required that FBI agents become involved in "unsavory" undercover operations, but was forced by presidential directive to allow undercover FBI activities in defense intelligence matters during World War II.  *Id.* at 36–37.  Following Hoover's death his successor, Clarence M. Kelly, with the support of Congress, and pursuant to widespread public demand, began to move the FBI into "big cases" involving *white-collar* and organized crime.  *Id.* at 40–41.

Initially, the FBI, in cooperation with local law enforcement authorities, established undercover fencing operations, gaining valuable experience in undercover techniques "that avoided claims of entrapment." *Id.* at 40.  Thereafter, the FBI's undercover activities have expanded to include "investigations of white-collar crimes, political corruption, personal and property crimes, and racketeering crimes." *Id.* at 43.  The FBI now also has responsibility to investigate violations of the criminal drug laws of the United States.  28 C.F.R. § 0.85(a) (1982).  Unfortunately, the government cannot select the nature of the crimes that will be committed and the detection of many of these "big" crimes require highly sophisticated undercover operations.  Congressional appropriations for such undercover activity have increased substantially, from $1 million for 53 operations in 1977 to $4.5 million for 463 operations in 1981.  *Id.* at 42.  Thus, although large FBI undercover operations might once have been characterized as extraordinary, such operations are now clearly part of the FBI's routine activities and their legality is not destroyed by their imaginative character.

My colleagues also criticize the failure of the FBI to closely supervise the Abscam operation. *Infra,* at 1474–1475.  To the extent that this criticism extends to the non-FBI middlemen, such as Ciuzio, Rosenberg and Weisz, involved in Abscam, their activities could hardly be "supervised" because they did not know Ab-

stolen goods or contraband drugs, Abscam bought corrupt official influence in Congress. Such government involvement in crime does not violate principles of due process.

We need not determine the exact limits on government involvement in crime imposed by the due process clause for it is clear that the FBI's involvement in Abscam was less than that government involvement found unobjectionable by the Supreme Court.[52] In *Hampton,* the defendant asserted that a government informant suggested the defendant could make money by selling drugs, supplied the defendant with drugs, and provided the purchasers—who were also government agents—of those drugs. *Hampton v. United States, supra,* 425 U.S. at 486–87, 96 S.Ct. at 1648. Justice Brennan characterized the government's activity as "doing nothing less than buying contraband from itself through an intermediary and jailing the intermediary." *Id.* at 498, 96 S.Ct. at 1654 (Brennan, J., dissenting). Similarly, in *Russell,* a government agent provided the defendant with a scarce chemical essential for the unlawful manufacture of methamphetamine, and purchased the

illicit product. *United States v. Russell, supra,* 411 U.S. at 424, 93 S.Ct. at 1639.

In each of these cases the government not only provided an *opportunity* to commit a crime, but also provided the *means* to commit that crime. Nevertheless, in each case the Supreme Court concluded that the government's conduct did not violate due process. *Hampton v. United States, supra,* 425 U.S. at 485, 490–91, 96 S.Ct. at 1648, 1650; *id.* at 491–92, 96 S.Ct. at 1650–1651 (Powell, J., concurring); *United States v. Russell, supra,* 411 U.S. at 424–25, 93 S.Ct. at 1639. Where, as in Abscam, the government simply provides the opportunity to commit a crime, prosecution of a defendant does not violate principles of due process. This conclusion is in accord with decisions of the Second and Third Circuits upholding Abscam convictions challenged on due process grounds. *United States v. Williams,* 705 F.2d 603 (2d Cir.1983); *United States v. Myers,* 692 F.2d 823 (2d Cir.1982); *United States v. Alexandro,* 675 F.2d 34 (2d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 78, 74 L.Ed.2d 75 (1982); *United States v. Jannotti,* 673 F.2d 578 (3d Cir.) (en banc), *cert.*

scam was an undercover investigation. The FBI took considerable precautions to compensate for its inability to control the representations of the middlemen. *See* note 50 *supra.*

Finally, *my* colleagues appear to *criticize* the amount of money and other benefits offered by Abscam to Kelly. *Infra,* at 1477. In my view the sums offered were not unreasonable or "outrageous," particularly if it is remembered that Abscam was dealing with corruption of high government officials and historically in such cases substantial payments are made. Examples are legion: *United States v. Jannotti,* 673 F.2d 578, 598–99 (3d Cir.) (en banc), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982) (bribery of member of Philadelphia City Council; payments in range of $10,000 to $30,000 not excessive); *United States v. Manton,* 107 F.2d 834, 840–44 (2d Cir.1938), *cert. denied,* 309 U.S. 664, 60 S.Ct. 590, 84 L.Ed. 1012 (1940) (bribery of circuit judge of United States Court of Appeals for the Second Circuit; payment in Depression dollars totaling over $188,000; payments ranged from $11,500 to $60,000); *Fall v. United States,* 49 F.2d 506, 512 (D.C.Cir.), *cert. denied,* 283 U.S. 867, 51 S.Ct. 657, 75 L.Ed. 1471 (1931) (Tea Pot Dome scandal; bribery of cabinet officer; payments of large amounts of government bonds

and "loan" of $100,000, worth at least $1 million today); *United States v. Williams,* No. 81 CR 269 (N.D.Ill. May 1981) (conspiracy to bribe United States Senator from Nevada; offered Las Vegas property valued at approximately $1.6 million at $200,000 discount; *see* N.Y. Times, Oct. 22, 1982, at A18, col. 1). Many other cases could be cited but no more are necessary to establish that the sums offered Kelly were not "in excess of real-world opportunities" even though that is not the test. *Infra,* at 1477. Had they been Kelly would have become suspicious and would have shied away. That the bait was taken here is the best evidence that it was within the "real world" of the Congressman, i.e., that his "price" was estimated correctly.

**52.** For this reason, we need not decide the validity of the due process test formulated by the district court—whether the temptation offered is "one which the individual is likely to encounter in the ordinary course." *United States v. Kelly, supra,* 539 F.Supp. at 374. It is suggested, however, that criminal conduct being as highly varied as it is that such test is unduly speculative.

*denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982).[53]

## C. Specific Claims

### 1. Reasonable Suspicion

Nor do any of the specifically challenged FBI actions in furtherance of Abscam reach that "demonstrable level of outrageousness" which would bar Kelly's prosecution. The district court stressed that Abscam's asylum scenario was not triggered by any suspicion of corruption in government. *United States v. Kelly, supra,* 539 F.Supp. at 371. Yet prior to setting the asylum scenario in motion, Abscam had uncovered evidence of official corruption in New Jersey[54] and in the Immigration and Naturalization Service.[55] Prior to enlisting Rosenberg's aid in the asylum scenario, the Abscam operatives had seen at least one congressman accept a bribe for immigration assistance. *United States v. Myers, supra,* 692 F.2d at 830–31. Finally, prior to the January 8 meeting with Kelly, the Abscam operatives had evidence from which they could conclude that Kelly was, in fact, corrupt. Ciuzio stated as much in his meeting with Amoroso and Weinberg on December 19.[56] Furthermore, *Ciuzio told Weinberg on December 20 that he asked Kelly to call*

him from a "safe" phone booth to discuss the transaction; that Kelly did so was strong evidence for the Abscam operatives that Kelly was fully aware that he was participating in an illicit transaction.[57] Thus, the FBI had ample suspicion of corruption to justify pursuing the asylum scenario and Kelly, if such suspicion was necessary.[58] In asserting the contrary, my colleagues, without explanation, fail to give a common sense interpretation to the uncontradicted evidence in the record. See Sep. Op., *infra,* at 1 n. 1. Members of the federal judiciary have no power to veto law enforcement practices merely because such practices offend their personal tastes. *Cf. Hampton v. United States, supra,* 425 U.S. at 490, 96 S.Ct. at 1650 (entrapment); *United States v. Russell, supra,* 411 U.S. at 435, 93 S.Ct. at 1644 (same).

### 2. Utilization of Weinberg

It is submitted that Kelly's argument that the FBI violated due process by utilizing the services of an admitted confidence man, Melvin Weinberg, in Abscam should likewise be rejected. Successful creation of an "elaborate hoax" such as Abscam may well *require* employment of "experts" such as Weinberg to give the operation an aura

**53.** The Third Circuit's decision in *Jannotti* is particularly significant because it held that *United States v. Twigg,* 588 F.2d 373 (3d Cir. 1978), the only post-*Hampton* case to uphold a due process challenge to prosecution because of excessive government involvement, did not control its consideration of Abscam. *United States v. Jannotti, supra,* 673 F.2d at 608–10 & n. 17. Thus Kelly's reliance on *Twigg* is misplaced.

**54.** *See* note 9 *supra.*

**55.** *United States v. Alexandro, supra,* 675 F.2d at 36–38.

**56.** *See* note 27 *supra.* Contrary to the statements of my colleagues and the district court, not all of Ciuzio's statements regarding Kelly were clearly false. *See infra,* at 1474–1475 n. 1; *United States v. Kelly, supra,* 539 F.Supp. at 367. Ciuzio told the Abscam agents that Kelly needed the bribe money "to straighten his whole life out" because he had used "a little f___ing money he ain't supposed to use . . . ." Transcript of Meeting of Dec. 19, 1979, at 17. Kelly admitted that he had discussed the

amount of his indebtedness with Ciuzio at their meeting at the Tampa Airport on November 23, although he offered no explanation why he discussed his personal finances with a man he was meeting for only the third time. *See* note 20 *supra.* This conversation provides evidence that Ciuzio spoke truthfully when he told the Abscam agents that Kelly intended to use the money from the illicit transaction to pay his debts.

**57.** *See* note 32 *supra. Kelly admitted* calling Ciuzio from a public phone booth at Ciuzio's request. Tr. at 2685–86.

**58.** Although we need not decide the question, both the Second and Third Circuits have rejected the argument that the government must have reasonable suspicion of wrongdoing before proceeding with an undercover operation such as Abscam. *United States v. Jannotti, supra,* 673 F.2d at 608–09; *United States v. Myers,* 635 F.2d 932, 941 (2d Cir.), *cert. denied,* 449 U.S. 956, 101 S.Ct. 364, 66 L.Ed.2d 221 (1980).

of "credibility" and "contacts" with criminal elements. The employment of a convicted confidence man in Abscam is analogous to the entirely proper employment of a convicted seller of drugs to purchase drugs from a suspected distributor. As the Second Circuit stated:

> [U]se of dishonest and deceitful informants like Weinberg creates risks to which the attention of juries must be forcefully called, but the Due Process Clause does not forbid their employment, detail their supervision, nor specify their compensation.

*United States v. Myers, supra,* 692 F.2d at 846. In this case, Weinberg's checkered background and dubious credibility were brought before the jury through vigorous cross-examination. The jury was entitled to consider Weinberg's testimony and give it such weight as it found appropriate. In my view there was no error of constitutional dimension in the FBI's use of Weinberg's services in Abscam.

### 3. *Failure to Memorialize Conversations*

Similarly, Kelly's claim that the FBI violated due process by failing to record or memorialize every conversation between Weinberg and Kelly's codefendants is without merit. At trial, only *Weisz* seriously challenged Weinberg's version of an unre-

corded conversation—a five minute telephone conversation with Weisz on December 21, 1979.[59] Kelly had the benefit of Weisz' "exculpatory" version of this conversation at trial[60] and has failed to explain how any of the other unrecorded conversations would have added anything of significance to his defense. The FBI operatives successfully recorded the vast majority of their communications with Kelly and his codefendants, including all but one of their critical conversations.[61] The FBI's occasional failure to record Abscam conversations does not constitute a due process violation.[62]

### 4. *Multiple Bribe Offers*

Finally, Kelly contends that the FBI operatives violated due process when they persisted in offering a bribe after what he characterizes as his initial rejection. Kelly asserts that he rejected the bribe at his meeting with Ciuzio on December 23, that Ciuzio informed Amoroso and Weinberg of that fact at the townhouse on January 8, and that he rejected the bribe several times in his meeting with Amoroso. Kelly argues, and the district court agreed, that under these circumstances Amoroso's several bribe offers to Kelly were outrageous and violated due process. *United States v.*

---

**59.** Tr. at 3791–94, 3798–802, 3810–11. There was apparently only one other significant unrecorded conversation between Weinberg and Kelly's codefendants—an eleven minute telephone conversation between Weinberg and Ciuzio on December 18, 1979. Tr. at 1276–77, 1282–84, 1615–18. Amoroso testified that he did not prepare a memorandum on that conversation because their meeting with Ciuzio the following day allowed him to bring out everything discussed in that conversation. Tr. at 1276–77. *See* Tr. at 1053–54, 1058.

**60.** Tr. at 3857–77.

**61.** I suspect that Kelly is more upset with Abscam's considerable success in *recording* conversations than with its occasional failures in that regard.

**62.** *See United States v. Myers, supra,* 692 F.2d at 846.

Kelly's reliance on a line of cases requiring government *preservation and production at trial of notes and tapes created during an investi-*

gation is inapposite. *See United States v. Bundy,* 472 F.2d 1266 (D.C.Cir.1972) (per curiam); *United States v. Bryant,* 439 F.2d 642 (D.C.Cir. 1971). In those cases we dealt with

> the legal consequences of *intentional nonpreservation by investigative officials of highly relevant evidence,* colored by clear reluctance even to admit that the evidence ever existed at all.

*United States v. Bryant, supra,* 439 F.2d at 647 (emphasis added). We have subsequently held that the government is not required to preserve or produce insignificant or irrelevant evidence. *United States v. Bowles,* 488 F.2d 1307, 1313 (D.C.Cir.1973), *cert. denied,* 415 U.S. 991, 94 S.Ct. 1591, 39 L.Ed.2d 888 (1974). Kelly does not assert that the Abscam operatives deliberately destroyed recordings of the conversations at issue; he merely claims that Weinberg failed to record them. Nothing in the *Bryant* line of cases suggests that the government is required to *create* documentary evidence of all conversations.

*Kelly, supra,* 539 F.Supp. at 374–76. I cannot agree.

The evidence in this case clearly demonstrates that at no time did Kelly reject Abscam's corrupt immigration proposal. On both December 23 and January 8, Kelly agreed to assure the wealthy Arabs that he would help them with their immigration problems as a favor to Ciuzio, despite the fact that Kelly knew that in return the Arabs would pay substantial sums to Ciuzio, Rosenberg, and Weisz.[63] It is also clear that Kelly understood that part of the arrangement was that the Arabs would make substantial investments in his district.[64] Such agreements, which would benefit Kelly indirectly, constitute violations of the bribery statute.[65] Furthermore, the discussions between Ciuzio, Kelly, and the Abscam operatives at the townhouse of January 8 focused on the *manner* in which the bribe would be paid, not on whether it would be paid. Ciuzio told Weinberg not to bribe Kelly directly, but agreed that he would take the money for Kelly.[66] After agreeing that Amoroso was going to give him some money at the meeting, Kelly asked Amoroso to pay the bribe to Ciuzio—to "deal with [Ciuzio] about it."[67] In my view, Congressman Kelly "did not reject a bribe, he [initially] rejected its payment under circumstances he feared would be incriminating." *United States v. Myers, supra,* 692 F.2d at 838.[68]

I likewise reject Kelly's characterization of his conversation with Amoroso on January 8 as a *series* of bribe offers. Although the terms of the corrupt Abscam proposal were mentioned several times during that conversation, Amoroso's discussion reflects the evasive and circumspect negotiation to be expected of a person seeking to corrupt a public official. In my view, Amoroso's conversation with Kelly on January 8 can be fairly characterized only as a *single offer* of a corrupt proposal to Kelly.[69] For these reasons I reject Kelly's contention that he initially rejected a bribe, that the Abscam agents persisted in offering him a bribe, and that they thus violated due process.

### IV. CONCLUSION

Like the district court,

we like to think, and we hope, that our Congressmen and Senators, and indeed all public servants, are strong enough to withstand any imaginable pressure and reject any type of temptation no matter how attractive, and walk away.... But in reality, *the hard fact is that our public servants* are not recruited from the seminaries and monastaries across the land and that they *are plagued by the frailties of human nature.*

*United States v. Kelly, supra,* 539 F.Supp. at 375 (emphasis added). Because of this fact and because dishonest public officials, responsive more to money than to their obligations to the nation, may cause grave harm to our society, we recognize the need for law enforcement efforts to detect offi-

**63.** Transcript of Meeting of Jan. 8, 1980, at 16; Tr. at 2661–66, 2848–57.

**64.** Transcript of Meeting of Jan. 8, 1980, at 12–13; Tr. at 2664–65.

**65.** *See* 18 U.S.C. § 201(c) (1976). The district court so instructed the jury. Tr. at 4920.

**66.** Transcript of Meeting of Jan. 8, 1980, at 1–11. *See* notes 38–39 and accompanying text *supra.*

**67.** Transcript of Meeting of Jan. 8, 1980, at 22–23. *See* text accompanying note 44 *supra.*

**68.** In *Myers,* the Second Circuit considered the appeal of Congressman Frank Thompson, who first met Amoroso and Weinberg on the morning of October 9, 1979. At that meeting Thompson rejected Amoroso's offer of money and left. After further discussions with an intermediary, Howard Criden, Thompson again met with Amoroso, agreed to assist the wealthy Arabs, and asked Criden to "look after" the $50,000 offered by Amoroso. Criden carried the money from the meeting. *United States v. Myers, supra,* 692 F.2d at 832–33. On these facts, which in many respects are more favorable to a due process defense than those in Kelly's case, the Second Circuit rejected Thompson's claim that the FBI violated due process by offering a bribe after his initial rejection of the bribe at the first meeting. *Id.* at 838.

**69.** *See* Tr. at 1125–31, 1178–79.

cial corruption. Furthermore, such corruption is "that type of elusive, difficult to detect, covert crime which may justify Government infiltration and undercover activities." *United States v. Alexandro, supra*, 675 F.2d at 42 (footnote omitted).[70]

The Supreme Court has made it clear that "a successful due process defense must be predicated on *intolerable government conduct* which goes beyond that necessary to sustain an entrapment defense." *United States v. Jannotti, supra*, 673 F.2d at 607 (emphasis added). Considering the genuine need to detect corrupt public officials, as well as the difficulties inherent in doing so, we conclude that the FBI's conduct in furtherance of its Abscam operation, insofar as it involved Kelly, simply did not reach intolerable levels. Accordingly, having carefully considered all of Kelly's claims that the government's conduct violated due process, we reverse the district court's dismissal of the indictment, as well as its entry of the judgment of acquittal, and direct the dis-

trict court to reinstate the indictment and the verdict of the jury.

*Judgment accordingly.*

GINSBURG, Circuit Judge:

■ "Abscam," as the District Court's thoughtful opinion details, was an extraordinary operation. The investigation was steered in large part by a convicted swindler; it relied upon con men to identify and attract targets, to whom legitimate as well as illegitimate inducements were offered; it proceeded without close supervision by responsible officials.[1] The District Court allowed the jury to determine whether defendant Kelly was "predisposed" to commit the crime charged, and therefore not "entrapped" under the current definition of that defense.[2] After the jury returned a guilty verdict, however, the District Court dismissed the indictment against Kelly on the ground that the government's conduct of the investigation was fundamentally unfair, and therefore incompatible with due process.[3] The sole issue properly before us

---

**70.** *Accord Baucom v. Martin*, 677 F.2d 1346, 1350–51 (11th Cir.1982); *United States v. Jannotti, supra*, 673 F.2d at 609. *See Hampton v. United States, supra*, 425 U.S. at 495 n. 7, 96 S.Ct. at 1653 n. 7 (Powell, J., concurring); *United States v. Russell, supra*, 411 U.S. at 432, 93 S.Ct. at 1643.

**1.** *See United States v. Kelly*, 539 F.Supp. 363, 366–67, 367 n. 16 and accompanying text, 374 n. 48 and accompanying text (D.D.C.1982).

We do not share Judge MacKinnon's view that, apart from "trappings of wealth," Abscam "was *not* significantly different from" run-of-the-mine "passive" undercover operations. *See* Judge MacKinnon's opinion, *supra* at p. 1469–1470 & note 51. As the District Court's opinion sets out in painstaking detail, the Abscam actors did a good deal more than simply "spread the word." Nor can we agree with Judge MacKinnon that the FBI "had ample suspicion of corruption to justify pursuing . . . Kelly." *Id.* at p. 1471. That suspicion, as Judge MacKinnon recites, was based on Ciuzio's report to Amoroso and Weinberg that "Kelly was, in fact, corrupt." *Id.* at p. 1471. But as the District Court observed:

Ciuzio went to great lengths to make it appear that he had virtual control over the Congressman, indicating at the time that Kelly was dishonest and was already taking money and had various other weaknesses. He indicated that he had known and cultivated Kelly for about 2½ years. None of this

was true. No attempt was made to verify it; and there is no indication that Weinberg and Amoroso believed it.

539 F.Supp. at 367 (footnotes omitted).

**2.** In contrast to an "objective" test that measures the methods used to induce the criminal act against standards of acceptable police behavior, the current, "subjective" test of entrapment looks to the propensity or "predisposition" of the induced defendant to engage in the proscribed conduct. *See United States v. Jannotti*, 673 F.2d 578, 596–98 (3d Cir.) (en banc) (summarizing Supreme Court precedent), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982); *United States v. Myers*, 692 F.2d 823, 835–36 (2d Cir.1982).

**3.** In so ruling, the District Judge did not purport to determine whether the government produced sufficient evidence to warrant a jury finding that Kelly was "predisposed" to receive a bribe. Rather, his analysis centered on the nature of the government's overtures. 539 F.Supp. at 376–77. *Cf. United States v. Jannotti, supra*, 673 F.2d at 607–08 (lower courts must resist permitting objective test of entrapment, rejected by the Supreme Court, to reemerge as a due process defense; entrapment defense reflects Court's view of legislative intent and Congress may reshape the defense as it sees fit).

for review is the correctness of the due process ruling.[4]

The District Court stated and attempted to apply an objective test to determine when government investigation exceeds tolerable limits: Was the crime-inducing conduct in which the government engaged, the temptation presented to the target, modeled on reality?[5] This test, the District Court indicated, should apply when the government had no knowledge of prior wrongdoing by the target and no reason to believe the target was about to commit a crime;[6] it would serve as a check against government creation (rather than apprehension) of criminals by offers or importuning that would never occur in the real world.[7]

The real-world test, as applied by the District Court, is speculative. The District Judge assumed that a person who offers a bribe would retreat upon encountering an initial rejection and would not "have the audacity" to press on "for fear of being reported."[8] But the first overture renders the party offering the bribe vulnerable to prosecution. "In for a calf," such a person might press on if he perceives any chance of ultimate success.[9] Nonetheless, were the slate clean, we might be attracted to an approach similar to the District Court's, and would perhaps ask whether, in real-world circumstances, the person snared would ever encounter bait as alluring as the offer the government tendered.[10]

However, our slate contains references that lower courts are not positioned to erase. We may not alter the contours of the entrapment defense under a due process

---

4. As the District Judge recognized, "there is a tendency for the due process defense to overlap with the entrapment defense." 539 F.Supp. at 376 (footnote omitted). However, on this appeal pursued by the government, only the due process defense is properly presented.

5. As the District Court phrased it: "The litmus test—or temptation—should be one which the individual is likely to encounter in the ordinary course." 539 F.Supp. at 374 (footnote omitted).

6. See id. at 371 (Abscam was launched without "even the remotest suspicion about the existence [in general or with respect to any particular individual] of any prior, on-going, or imminent criminal activity"); id. at 373 (Department of Justice and FBI had "not even a scent of suspicion of criminal conduct, past, present, or imminent . . . by Kelly").

7. The District Court noted that, immediately after Abscam became public, the Assistant Attorney General, Criminal Division, testified in congressional hearings that modeling the transaction after reality serves as a "guarantee of fairness" to the individual "because it means that anybody who is brought in, is brought in with the same type of temptation[ ] that we know is floating out there." Id. at 374 n. 47, citing FBI Oversight: Hearings Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary, 96th Cong., 2d Sess. 154 (1980).

8. 539 F.Supp. at 374, 376, 377. As the District Judge finally phrased his application of the real-world test: "If after an illegal offer is made, the subject rejects it in any fashion, the government cannot press on." Id. at 377.

9. As the government points out, Brief for Appellant at 68, parties to real-world transactions could readily adjust to a one-refusal rule: the bribe taker would always resist the first overture.

10. The inquiry might extend to the nature of the reward and quid pro quo authorized by responsible officials of the Department of Justice and the FBI, the efforts made to assure that those who carried out the scam adhered to the approved script, and the nature of the transaction in fact proposed to the target. The tolerable limit would be crossed if the opportunity offered differed qualitatively from, and therefore was more difficult to resist than, those the target would otherwise encounter. See Spera, Protecting the "Otherwise Innocent": An Alternate Standard for Entrapment (Draft, 1982).

Exchanges such as this one between an FBI agent and Ciuzio, the unwitting middle-man who conveyed the FBI's offer to Kelly, would invite particular scrutiny:

[Ciuzio] Now, you you're saying ya gonna give em twenty-five thousand
[FBI Agent] Right
[Ciuzio] For doin nothin
[FBI Agent] For doin nothin
[Ciuzio] To stand by
[FBI Agent] To stand by. And if the guy comes, when the guy comes . . .

Transcript of 12:13 p.m. meeting, Dec. 19, 1979, at 29.

cloak,[11] and we lack authority, where no *specific* constitutional right of the defendant has been violated, to dismiss indictments as an exercise of supervisory power over the conduct of federal law enforcement agents. *See United States v. Payner,* 447 U.S. 727, 737 n. 9, 100 S.Ct. 2439, 2447 n. 9, 65 L.Ed.2d 468 (1980).[12] Precedent dictates that we refrain from applying the general due process constraint to bar a conviction except in the rare instance of "[p]olice overinvolvement in crime" that reaches "a demonstrable level of outrageousness." *Hampton v. United States,* 425 U.S. 484, 495 & n. 7, 96 S.Ct. 1646, 1653 & n. 7, 48 L.Ed.2d 113 (1976) (Powell, J., concurring) (cases, "if any," in which a "predisposed" defendant can successfully invoke a due process defense "will be rare"); *United States v. Rus-*

*sell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–1643, 36 L.Ed.2d 366 (1973).

The requisite level of outrageousness, the Supreme Court has indicated, is not established merely upon a showing of obnoxious behavior or even flagrant misconduct on the part of the police; the broad "fundamental fairness" guarantee, it appears from High Court decisions, is not transgressed absent "coercion, violence or brutality to the person." *See Irvine v. California,* 347 U.S. 128, 132–33, 74 S.Ct. 381, 382–383, 98 L.Ed. 561 (1954) (distinguishing *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952)). Without further Supreme Court elaboration, we have no guide to a more dynamic definition of the outrageousness concept, and no warrant, as lower court judges, to devise such a definition in advance of any signal to do so from higher authority.[13]

---

11. *See United States v. Twigg,* 588 F.2d 373, 382 (3d Cir.1978) (Adams, J., dissenting).

12. *See also United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979) (noncompliance with internal departmental guidelines is insufficient cause for excluding evidence).

13. Lower courts have generally read Supreme Court precedent to confine the broad due process check on the conduct of law enforcement officers to the slim category of cases in which the police have been brutal, employing against the defendant physical or psychological coercion that "shocks the conscience." *See, e.g., United States v. Alexandro,* 675 F.2d 34, 40 (2d Cir.), *cert. denied,* — U.S. —, 103 S.Ct. 78, 74 L.Ed.2d 75 (1982) (attempted bribery of immigration official) ("The distinction between the ["shocking"] cases and the instant one is clear. There, the challenged conduct ranged from an invasion into the integrity of the body to an extraordinarily coercive interrogation. The activities called into question here, however, merely involve special investigative techniques for obtaining evidence of Alexandro's voluntary participation and do not entail bodily invasion."); *Yanez v. Romero,* 619 F.2d 851, 855 (10th Cir.), *cert. denied,* 449 U.S. 876, 101 S.Ct. 221, 66 L.Ed.2d 98 (1980) (threat to use a catheter to take urine sample from recalcitrant prisoner not shocking) ("It was very likely the lack of force and brutality which was instrumental in the Court's ruling [in *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) ]."); *United States v. Ford,* 553 F.2d 146, 155 n. 34 (D.C.Cir.1977) ("The *Irvine* case did not fall within the exclusionary rule of *Rochin* . . . because there had been no

coercion, violence, or brutality to the person.") (dictum); *United States v. VanMaanen,* 547 F.2d 50 (8th Cir.1976) (not shocking that police prepared false reports, advised witness to leave town, failed to disclose before trial existence of informant); *United States v. Gengler,* 510 F.2d 62 (2d Cir.) (kidnapping of defendant from Bolivia and transportation to the United States not shocking), *cert. denied,* 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975); *United States v. Harrison,* 432 F.2d 1328 (D.C.Cir. 1970) (grabbing throat to prevent swallowing of heroin capsules not shocking because calculated to prevent destruction of evidence); *Rivas v. United States,* 368 F.2d 703, 710–11 (9th Cir.1966) (body cavity border search) ("This is *not* a *Rochin* case, with its physical assault on a defendant, both before the stomach pumping, and at the time of its occurrence. It was the *physical assault* in *Rochin* which caused reversal . . . ."), *cert. denied,* 386 U.S. 945, 87 S.Ct. 980, 17 L.Ed.2d 875 (1967); *Blefare v. United States,* 362 F.2d 870 (9th Cir.1966) (in connection with border search, rectal examination, administering an emetic, stomach pumping, largely without objection by defendant, not shocking); *United States v. Baskes,* 442 F.Supp. 322, 333 (N.D.Ill.1977) ("In *Irvine* itself, the Supreme Court apparently limited application of the supervisory powers doctrine to cases which involved 'coercion, violence or brutality to the person.' ") (dictum), *aff'd,* 649 F.2d 471 (7th Cir.1980).

*Contrast Hall v. Tawney,* 621 F.2d 607, 613 (4th Cir.1980) (corporal punishment of students might violate due process if it "amounted to a brutal and inhumane abuse of official power, literally shocking to the conscience"); *Huguez v. United States,* 406 F.2d 366, 379 (9th Cir.

The importuning of Congressman Kelly and the offers made to him, extraordinary and in excess of real-world opportunities as they appear to have been, did not involve the infliction of pain or physical or psychological coercion. We are therefore constrained to reverse, although we share the District Court's grave concern that the Abscam drama, both in its general tenor, and in "the [particular] manner in which Kelly was handled," 539 F.Supp. at 373, unfolded as "an unwholesome spectacle."

1969) (warrantless border search of rectal cavity without clear prior indication it contained narcotics shocking) (dictum).

*But see United States v. Valencia,* 541 F.2d 618, 621–22 (6th Cir.1976) (violation of attorney-client privilege of codefendant may be grounds for dismissing charges).