UNITED STATES of America, Appellee,

v.

Phillip H. NICELY, et al., Appellants.

Nos. 89–3104, 89–3191 to
89–3193, 90–3106.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 7, 1990.

Decided Jan. 4, 1991.

Alan P. Bayles (appointed by the Court) for appellant, Phillip H. Nicely, in 89–3104.

Edward C. Sussman (appointed by the Court) for appellant, Billy H. Blankenship, in 89–3191.

William J. Garber (appointed by the Court) for appellant, Stewart A. Koral, in 89–3192.

Dennis M. Hart (appointed by the Court) for appellant, Walter E. Johnson, in 89–3193.

G. Godwin Oyewole (appointed by the Court) for appellant, James Jesse Smith, in 90–3106.

Lynn Leibovitz, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher and Brian Murtagh, Asst. U.S. Attys., were on the brief, for appellee, in all cases.

Before MIKVA, EDWARDS and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

Appellants James J. Smith, Billy H. Blankenship, Stewart A. Koral and Walter E. Johnson were convicted of offenses related to an alleged scheme to defraud the SCT Corporation, including conspiracy to defraud and causing persons to travel in interstate commerce in the execution of a scheme to defraud. In addition, these four men along with appellant Phillip H. Nicely were convicted of offenses related to a scheme to launder money provided by an undercover IRS agent. Appellants raise several issues on appeal including misjoinder of separate conspiracies, sufficiency of the evidence, and governmental misconduct in inducing the money laundering activities. Because we hold that the conspiracies charged in the indictment were misjoined and caused prejudice to the defendants, we reverse the convictions.

## I.  BACKGROUND

We first set out some of the convoluted facts in this case to provide the backdrop for our decision. We believe that even our brief synopsis highlights the essential disparities between the two alleged conspiracies charged in a single indictment by the government in this case. That the narrative appears somewhat disjointed flows from the inherent misjoinder of the two basically unrelated conspiracies.

In October 1985, officers of the Systems and Computer Technology Corporation ("SCT") first met with appellant James J. Smith in Washington, D.C. to discuss the possibility of acquiring government contracts. At a subsequent meeting in December, Smith indicated to them that his organization, Kelgre Investment Corporation ("Kelgre"), could be retained to help SCT obtain federal government contracts, citing as examples four recent projects he had successfully undertaken for other clients. A few weeks later, appellants Smith and Billy H. Blankenship (Smith's partner at Kelgre) met with officers at SCT headquarters in Pennsylvania to work out a retainer agreement. Smith first arranged for an SCT officer to verify his work with a couple of Kelgre's existing clients and also mentioned that President Reagan was soon to announce a plan to revamp the nation's currency system. After verifying Kelgre's work for other clients, SCT officials met Smith again in Washington in January 1986. Smith indicated that he could obtain a subcontract for SCT to provide computers for a secret new money project called "ICIS." SCT then entered into a retainer agreement with Kelgre for $10,000 per month plus a percentage of any contract obtained through Kelgre's efforts.

During the spring of 1986, discussions were held concerning a proposed feasibility study by SCT for the European Arabian Trust ("EAT"), one of Kelgre's existing clients and, according to Smith, the company slated to be the prime contractor on the ICIS project. According to Smith, EAT (which he described as a front company run by former intelligence operatives) would release billions of ounces of gold (which it held in trust for the ancient Setia Darma foundation in Indonesia) to finance a U.S. currency reform and international debt stabilization program. Appellants Walter

Johnson and Stewart Koral were EAT's principal officers. Negotiations over the feasibility study stalled, and by the end of the year SCT refused to make its last monthly retainer payment to Kelgre (after having already paid Kelgre a total of $100,-000 under the agreement without seeing any results).

While all of this was happening, undercover IRS agent Robert Wallace was undertaking a money laundering investigation. When his then-target was unable to launder progressively larger amounts of cash, Agent Wallace was introduced to appellant Phillip Nicely in May 1986. Wallace told Nicely he had a lot of cash to move and that the names of the owners must never be disclosed. Nicely responded that the transfers could be completed in three days. On June 3, Wallace gave Nicely $100,000 in cash (plus a $6,000 commission) to eventually have it wired to a bank account in Miami. Nicely provided Wallace with a receipt and produced a letter indicating that Kelgre (which he was then trying to secure a job with) could first deposit the money in an account it had just opened at the Leeward Islands Bank & Trust (a subsidiary of EAT run by Johnson and Koral). (On May 29, Kelgre had opened an account at Leeward which in turn maintained two accounts with a Prudential–Bache office in New Hampshire.)

At a meeting in Washington on June 3, 1986, with appellant Smith present, Nicely turned the cash over to Kevin O'Brien, the account executive at Prudential–Bache, for deposit in the Leeward account. The next day, Mr. O'Brien called appellant Smith to obtain information for filling out a Currency Transaction Report (hereinafter "currency report") for the deposit, as required by 31 C.F.R. § 103.22 (1990). O'Brien entered an incorrect social security number and an incorrect middle initial for appellant Smith. (With respect to both errors, there is dispute over whether these were honest misunderstandings or whether appellant Smith intentionally misrepresented this information.) When, after several days, the $100,-000 had not been transferred to the account in the Miami bank, Agent Wallace went to Nicely's office to inquire what had happened, apparently becoming very threatening in the process. Agent Wallace then visited Smith, and Smith took full responsibility. On June 9, Smith called O'Brien to request a wire transfer. O'Brien demanded written authorization from Leeward's officers (appellants Koral and Johnson) before transferring the money on June 11. This was provided, and when the $100,000 had been credited to the undercover IRS account, another IRS agent immediately obtained and executed a search warrant for the Gaithersburg, Maryland offices of Kelgre.

In May, 1988, the government indicted all the malefactors in these nefarious activities in a single indictment. Count I claimed that the United States was defrauded by the conspiracy involving the defendants and SCT, Counts II and III charged a conspiracy to defraud the United States by failing to file and then falsifying material information in a currency report and a scheme to falsify information in a currency report in violation of 18 U.S.C. § 1001, and Counts IV and V charged the defendants with inducing SCT officials to travel interstate in violation of 18 U.S.C. § 2314. Nicely was named only in Counts II and III. All of the other defendants were named in all of the counts. At trial, the district court struck the allegation in Count I that the SCT conspiracy sought to defraud the United States. Before and during trial, the defendants moved for severance on grounds of misjoinder, but the motions were denied. *See, e.g.,* Order and Memorandum Opinion (Dec. 22, 1988), at 8 (hereinafter "Mem. Op."). With the exception of Johnson and Koral, who were both acquitted on Count IV, the defendants were convicted on all counts charged.

## II. Discussion

### A. *Misjoinder and Severance*

Appellants argue that they were prejudiced by the joinder of the two conspiracies and the district court's denial of their motions to sever. Their challenges on appeal proceed at two levels: (1) misjoinder under Rule 8(b) since the conspiracies were dis-

tinct, and (2) failure to sever under Rule 14 where defendants faced undue prejudice at a joint trial (even if joinder in the indictment had been appropriate). Since we conclude that there was misjoinder of offenses in the indictment justifying reversal, the latter claim need not detain us except insofar as it illuminates the prejudice at trial occasioned by the misjoinder.

### 1. Misjoinder of Separate Conspiracies.

■ Appellants contend that the two conspiracies did not have a common end or shared goal, and are not interconnected except for the happenstance of some common participants. Joinder involving multiple defendants is governed by Federal Rule of Criminal Procedure 8(b), which provides:

> Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

While this circuit's law makes it difficult to prevail on a claim that there has been a misjoinder under Rule 8(b), there are definite limits to what the government can put together in a single indictment. Rule 8(b)'s language "may not be read to embrace similar or even identical offenses, *unless* those offenses are related.... [T]here must be a logical relationship between the acts or transactions within the series." *United States v. Perry*, 731 F.2d 985, 990 (D.C.Cir.1984) (citations omitted). In *Perry*, this court upheld joinder in a drug prosecution, even though one of the defendants was not charged in one of the transactions, because the government showed a common scheme or plan spanning both transactions and both defendants. Similarly, in *United States v. Brown*, 823 F.2d 591, 598 (D.C.Cir.1987), this court applied the logical relationship test to find proper joinder in a case charging several members of the Original Hebrew Israelite Nation with a single overarching conspiracy to conduct the affairs of an enterprise

through a pattern of racketeering activity, followed by 68 specific counts charging fraudulent acts involving such items as forged checks and blank airline tickets (some of which were RICO predicate acts, while others were not). In this case, by contrast, the government has failed to show either a common scheme connecting the two conspiracies or any participation by Nicely in the SCT scheme and conspiracy. "[T]he mere fact that two conspiracies have overlapping memberships will not authorize a single indictment if the conspiracies cannot be tied together into one conspiracy, one common plan or scheme." *United States v. Velasquez*, 772 F.2d 1348, 1353 (7th Cir.1985), *cert. denied*, 475 U.S. 1021, 106 S.Ct. 1211, 89 L.Ed.2d 323 (1986).

The government's position on appeal is that the record shows two substantially interrelated conspiracies, insofar as the appellants constructed a sophisticated apparatus to maintain the illusion that they were involved in legitimate, well-funded projects associated with United States intelligence groups. Misrepresentations made in the course of both schemes included claims that some of the appellants were employed by the CIA, that an Asian trust held vast gold reserves which EAT could invest, and that there was a still-secret currency reform proposal. The government insists that a necessary component of both schemes was the "symbiotic" (its word) relationship between Kelgre (run by Smith and Blankenship) and EAT (and its subsidiary Leeward, both run by Johnson and Koral), whereby each lent credibility to the other via fraudulent misrepresentations. The currency reporting violations occurred at the height of the ongoing fraud of SCT, and all the defendants (except Nicely) were involved in both frauds, whose common objective, according to the government, was to make money by charging fees for the performance of services. The proffer of this narrative to the district court at the pretrial hearing on appellants' motion for severance under Rule 8(b) was even less well-defined (evidently, the prosecutor characterized it as "your all-purpose scam"). In light of this court's suggestion

in *Perry* that "the propriety of initial joinder is to be determined by the representations and evidence before the district court prior to trial," 731 F.2d at 987, 990–91, it is arguable that the government should be precluded from *post hoc* justifications for joinder that were not presented prior to trial.

We need not, however, decide the question of whether the propriety of joinder depends solely on what the government demonstrated prior to trial because we believe that even the government's explanation *after* trial is inadequate. This is most definitely not a situation where the prosecutors convey a sketchy explanation of the factual basis for the joinder to the district court prior to trial and then bolster the claim by the evidence adduced a trial. Here the reverse seems to have happened, namely a tenuous connection suggested prior to trial whose flimsiness became stark when put to the test at trial. Indeed, the government's unfortunate choice of the word "symbiotic" to now describe the basis for joinder is telling. The term evokes images of two very dissimilar creatures deriving some mutual benefit from each other's proximity (e.g., a hippopotamus and the small bird that eats ticks off its hide), but no one would understand their symbiosis as grounds for placing both animals in the same taxonomic group. We recognize, of course, that symbiosis technically refers to a range of mutually beneficial relationships between organisms, some of which are non-essential while others involve true interdependence. To that extent, one could find the non-essential variety of "symbiosis" present in this case, and our holding is in no way meant to foreclose the possibility of joining distinct but mutually interdependent conspiracies in a single indictment. *Cf. Brown*, 823 F.2d at 598 (numerous mutually interdependent scams properly made out a single, overarching conspiracy to conduct the affairs of an enterprise through a pattern of racketeering activities); *Perry*, 731 F.2d at 990.

Originally, the government's main arguments in support of joinder were that both conspiracies were against the Treasury Department and that evidence of each conspiracy would be cross-admissible in the case of the other under Federal Rule of Evidence 404(b). (This latter claim will be taken up below.) In denying the Rule 8(b) motion to sever, the district court relied on the common victimization of the Treasury Department. *See* Mem. Op. at 8 ("Both are conspiracies to defraud the United States Treasury Department."). However, at the close of the government's case, the court *struck* the allegation from Count I averring that the Treasury Department was the victim of the SCT conspiracy, but nevertheless denied defendants' renewed motions for severance. Once that allegation was struck from the indictment, there was no common victimization of Treasury left in the case, and severance on grounds of misjoinder then was necessary. *Cf. United States v. Ong*, 541 F.2d 331, 337–38 (2d Cir.1976) (holding that dismissal of the count justifying joinder will require severance if the defendants will be prejudiced by the joinder or if the dismissed count had not been alleged by the government in good faith), *cert. denied*, 429 U.S. 1075, 97 S.Ct. 814, 50 L.Ed.2d 793 (1977). The government must have known the flimsiness of this allegation in light of the Supreme Court's recent decision in *Tanner v. United States*, 483 U.S. 107, 128–32, 107 S.Ct. 2739, 2751–54, 97 L.Ed.2d 90 (1987) (rejecting an expansive interpretation of 18 U.S.C. § 371 since a conspiracy to defraud a private corporation does not constitute a conspiracy to defraud the United States unless the defendants had conspired to cause the private entity to make misrepresentations to a government agency).

Beyond the similarity in membership, the government points to nothing in common between the two conspiracies more specific than the common use of falsehoods to make money. The district court appears to have accepted the government's argument that both conspiracies shared a common method insofar as they both relied on "falsehoods about the relationship between Kelgre" and EAT. *See* Mem. Op. at 8. Telling lies, even elaborate ones, cannot be the hook for joining otherwise unrelated conspiracies. The SCT conspiracy did in-

volve various misrepresentations by four of the appellants suggesting that EAT had received the Treasury Department contract to implement a secret currency reform project, part of which it might subcontract to SCT. The currency reporting conspiracy, by contrast, did not involve monies obtained by fraud or any representations at all about nonexistent government contracts, and the whole scheme had run its course within a couple of weeks. The IRS sting operation, which had not targeted any of the appellants originally, stumbled upon Phillip Nicely just as he was seeking to associate with Kelgre. Because the currency reporting conspiracy predated legislation adding money laundering as a separate federal offense, *see* Pub.L. 99–570 (Oct. 27, 1986), codified at 18 U.S.C. § 1956, the government had to utilize parts of the Bank Secrecy Act, 31 U.S.C. §§ 5313, 5322, and the regulations promulgated thereunder, to build its money laundering case. Indeed, Smith's readily identifiable violations of those regulations, set off against the ongoing SCT conspiracy, laid the foundation for charging all five defendants with a conspiracy to defraud the United States.

In short, the government's justification for joinder of the conspiracies was "expounded in thoroughly conclusory terms." *United States v. Jackson,* 562 F.2d 789, 795 (D.C.Cir.1977) (footnote omitted). The government's choice of the word "symbiotic" on appeal to explain the link between the conspiracies is symptomatic of its inability to articulate a nexus between the schemes, and identifying the common objective as making money and the shared *modus operandi* as telling lies are patently insufficient grounds for joinder.

2. Actual Prejudice.

■ Although prejudice was at one time presumed from misjoinder, *see, e.g., Ward v. United States,* 289 F.2d 877, 878 (D.C. Cir.1961), recent cases make it clear that the harmless error standard now governs review of misjoinder claims and requires a finding of actual prejudice before reversal is appropriate. *See United States v. Lane,* 474 U.S. 438, 448–49, 106 S.Ct. 725, 731–32, 88 L.Ed.2d 814 (1986) (rejecting contention

that misjoinder is ever prejudicial *per se,* and holding that "an error involving misjoinder ... requires reversal only if the misjoinder results in actual prejudice"). In *Lane,* the Supreme Court held that misjoinder in that particular case constituted harmless error in light of the "overwhelming evidence of guilt," and because the trial judge had carefully instructed the jury to consider each count and each defendant separately, and the evidence "would likely have been" cross-admissible anyway. *See* 474 U.S. at 449–50, 106 S.Ct. at 732.

In part, this deferential standard of review is consistent with the preference for joint trials in the interests of judicial economy. *See, e.g., Lane,* 474 U.S. at 449, 106 S.Ct. at 732; *Perry,* 731 F.2d at 991 (alluding to "this Court's broad policy favoring initial joinder"). Such a preference cannot, however, trample a defendant's right to a fair trial. *See Cupo v. United States,* 359 F.2d 990, 993 (D.C.Cir.1966) ("[T]he Rules do not permit cumulation of prejudice by charging several defendants with similar but unrelated offenses."), *cert. denied,* 385 U.S. 1013, 87 S.Ct. 723, 17 L.Ed.2d 549 (1967). As this court has noted in connection with Rule 14, "[m]otions for severance are particularly sensitive in conspiracy cases because of the danger that the guilt of one defendant may be unjustly transferred to another." *United States v. Sutton,* 801 F.2d 1346, 1363–64 (D.C.Cir.1986). We must hold an error "prejudicial if one cannot reasonably conclude that the judgment was not substantially swayed by the error." *United States v. Treadwell,* 760 F.2d 327, 339 (D.C.Cir.1985) (citations omitted), *cert. denied,* 474 U.S. 1064, 106 S.Ct. 814, 88 L.Ed.2d 788 (1986). Furthermore, any serious doubts must be resolved in favor of the defendant. *See United States v. Freeman,* 514 F.2d 1314, 1320–21 (D.C. Cir.1975).

■ Appellants contend that the evidence regarding their participation in the conspiracies was scant at best, that limiting instructions could not assure proper compartmentalization of the evidence by the jury under the circumstances, and that much of the evidence adduced at trial

would not in fact have been admissible at separate trials. Indeed, by commingling allegations about the scheme to defraud SCT with the very specific charge concerning a regulatory infraction by Smith in providing false information on the currency report (which admits of fairly easy proof at trial), the government was able to fashion the currency reporting conspiracy from whole cloth. It is difficult to imagine a successful conviction of all five appellants on the currency reporting conspiracy if one removed the SCT allegations from the picture, and the presence of the testimony recounting the SCT misdeeds denied those appellants not centrally involved in the SCT scheme a trial on their wrongdoings on evidence limited to what was relevant to the currency reporting allegations.

Nicely contends that, because the prosecution witnesses for the separate conspiracies were taken out of order, the presentation of the government's case awkwardly fused the SCT and money laundering conspiracies, giving the unmistakable appearance to the jury that Nicely was enmeshed in both cases. In response, the government argues that only minor witnesses were taken out of order due to scheduling difficulties, that the two conspiracies were carefully distinguished in opening and closing arguments, and that the court properly instructed the jury. *See United States v. Butler*, 822 F.2d 1191, 1194 (D.C.Cir.1987). However, under similar circumstances, this court reversed a conviction for failure to sever under Rule 14. *See United States v. Sampol*, 636 F.2d 621 (D.C.Cir.1980) (per curiam). In *Sampol*, this court observed:

> Although the court's instructions were conscientious attempts by the trial court to limit the admission of evidence for only relevant purposes against Ignacio, the nuances and the breadth of some of the testimony made it inevitable that Ignacio would be prejudiced by the simultaneous presentation of testimony relating to the conspiracy and murder counts, with which Ignacio was not charged, and the misprision and false statements counts, with which he was.

*Id.* at 645. *See also United States v. Foskey*, 636 F.2d 517, 524 n. 6 (D.C.Cir.1980)

("In reviewing the record, we take into account not only the evidence itself, but also the manner in which it was presented to the jury.").

The government repeats its cross-admissibility argument here to show that a joint trial was no more prejudicial than two separate trials where evidence of the other conspiracy could be introduced at each. While it is no doubt true that some of the evidence adduced at the joint trial might be admissible in separate trials, the standard suggested in *Lane* asks whether the evidence "would likely have been" cross-admissible. *See* 474 U.S. at 450, 106 S.Ct. at 732. Although the government assures us that much of the evidence would have been cross-admissible under the Rule 404(b) exceptions (and we do not read *Lane* as an invitation to invade the province of the district court in making admissibility rulings), its contention does not withstand close scrutiny.

This court has repeatedly emphasized the narrow scope of the "bad acts" evidence exceptions under Rule 404(b) (such evidence may be used to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident") and the continuing applicability of the Rule 403 limitation on unduly prejudicial evidence even if an exception is satisfied. *See, e.g., United States v. Manner*, 887 F.2d 317, 321 (D.C.Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 879, 107 L.Ed.2d 962 (1990); *Foskey*, 636 F.2d at 523–26; *see also United States v. Shelton*, 628 F.2d 54, 56 (D.C.Cir.1980) ("[B]ecause of the enormous danger of prejudice to the defendant that evidence of other crimes creates," the evidence must be both necessary as well as clear and convincing.). "A fundamental tenet in our criminal jurisprudence is that a jury should not premise its verdict upon a general evaluation of the defendant's character but rather upon an assessment of the evidence relevant to the particular crime with which the defendant is presently charged." *United States v. Lavelle*, 751 F.2d 1266, 1275 (D.C.Cir.1985) (citations omitted). Recently, in *United States v. Rhodes*, 886 F.2d 375 (D.C.Cir.

1989), this court reversed a conviction for bank fraud and forgery because the admission of very similar but wholly unrelated fraudulent checks constituted plain error.

The government claims that evidence of each group of offenses would be admissible in a separate trial of the other to prove knowledge, criminal intent and common methods in accomplishing the schemes. Evidence of other crimes is, for instance, admissible when relevant to "a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of the one tends to establish the other." *Drew v. United States*, 331 F.2d 85, 90 (D.C.Cir.1964). Appellants respond that none of the Rule 404(b) exceptions apply. They argue that, since the conspiracies are unrelated, evidence of one would not be admissible to show intent or motive to commit the other. In fact, since we have concluded that the two conspiracies were not substantially alike, the exceptions have only limited application. *See Foskey*, 636 F.2d at 523–24 & n. 5. " '[W]hen a prior criminal act is relied upon to prove intent or knowledge, similarity between the two events must be shown to establish the threshold requirement of relevance.' " *Id.* at 524 (quoting *United States v. Hernandez–Miranda*, 601 F.2d 1104, 1108 (9th Cir.1979)). *Contrast United States v. Perholtz*, 842 F.2d 343, 358 (D.C. Cir.) (per curiam) (in an appeal from convictions for several schemes to fraudulently procure U.S. Postal Service contracts, the court upheld the admission of evidence that was "highly probative of efforts to further an ongoing scheme to defraud and demonstrate[d] conscious awareness of guilt on the part of the defendants"), *cert. denied*, 488 U.S. 821, 109 S.Ct. 65, 102 L.Ed.2d 42 (1988).

While it is true that both conspiracies used the same general background story of intelligence operatives and billions in Asian gold, none of this is relevant in proving a money laundering scheme to defraud the United States. (In connection with the currency reporting counts, Mr. O'Brien at Prudential–Bache was told these lies for no apparent reason, although the indictment avers that he had to be persuaded to under-

take the transactions.) Nor are we swayed by another minor connecting element to support cross-admissibility, namely Smith's references to the raid of Kelgre's office and subpoena growing out of the IRS sting to convince SCT that the Treasury Department was trying to take the currency reform project away from Kelgre. The government's remaining argument that evidence of falsehoods told in furtherance of one conspiracy "increased the likelihood that appellants intended to commit the fraud necessary to the other" falls under the clear prohibition against propensity evidence rather than one of the narrow exceptions.

Ultimately, we are forced to consider the Rule 404(b) admissibility questions because the district court failed to address them squarely. When Nicely renewed his motion for severance after most of the prosecution's SCT evidence was in but before the currency reporting case began, the trial court should have verified that any of the evidence so far presented would in fact have been admissible under Rule 404(b) on the question of intent in the money laundering case. *Cf. Foskey*, 636 F.2d at 525 n. 7. The evidence from the prosecution's SCT case indicating Smith's knowledge of the currency reporting requirements, which consisted of a short segment of testimony by one of SCT's senior vice-presidents and a memo to EAT concerning ICIS system parameters, could have been introduced at a separate trial of the currency reporting counts without ever describing the fraudulent scheme of which these items constituted only a very small part.

Even if some of the evidence was admissible under Rule 404(b), appellants contend that it would not have survived a Rule 403 balancing. While we are unwilling to speculate about a matter so clearly committed to the trial court's discretion, *see United States v. Payne*, 805 F.2d 1062, 1066 (D.C. Cir.1986), Rule 403 limitations would have had a clear impact on the presentation of evidence at separate trials. For example, the district court allowed the testimony of William Hein suggesting an additional conspiracy between Smith, Koral and a Dr.

O'Hare to defraud Southwest Regional Laboratories, one of Kelgre's clients, in connection with a government contract in the early 1980s. Appellants argue that Hein's testimony should have been excluded altogether under Rule 403 since its probative value was substantially outweighed by unfair prejudice. While we do not believe that the district court abused its discretion in admitting "evidence [that] is closely tied to the crimes charged and only indirectly suggests distinct offenses," *Perholtz*, 842 F.2d at 358, the admission of this testimony in connection with the SCT counts does, however, demonstrate the prejudice from the misjoinder faced by the defendants charged with the currency reporting violations. *Cf. Rhodes*, 886 F.2d at 380–82. *Contrast United States v. Tarantino*, 846 F.2d 1384, 1399 (D.C.Cir.) (per curiam) ("The evidence and the charges were substantially overlapping, but the overlap was caused by the involvement of each appellant in a single scheme."), *cert. denied*, 488 U.S. 840, 867, 109 S.Ct. 108, 174, 102 L.Ed.2d 83 (1988). Although our actual prejudice inquiry cannot avoid touching upon evidentiary matters, we do not mean to dictate in any way the district court's admissibility rulings on retrial.

Because the misjoinder effectively deprived the appellants of a fair trial in this case, we reverse.

### B. *Additional Objections*

#### 1. Sufficiency of the Evidence.

All five appellants contend that the district court erred in denying their motions for judgments of acquittal or new trial on grounds of insufficient evidence. In ruling on such a motion, trial and appellate courts " 'must view the evidence in the light most favorable to the Government giving full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact.' " *United States v. Treadwell*, 760 F.2d 327, 333 (D.C.Cir.1985) (citation omitted), *cert. denied*, 474 U.S. 1064, 106 S.Ct. 814, 88 L.Ed.2d 788 (1986). *See also United States v. Poston*, 902 F.2d 90, 94 (D.C.Cir. 1990) ("This court's role in assessing a suf-

ficiency of the evidence claim on appeal is sharply circumscribed."). After carefully reviewing the record, we reject appellants' sufficiency of the evidence challenges in their entirety. Although by no means overwhelming, there was ample evidence to support the jury's verdict in this case. Nor do we find any merit in appellants' related challenges to the sufficiency of the indictment or the jury instructions.

#### 2. Improper Venue.

■ Koral claims that the district court erred when it denied a motion to dismiss Count III (false statements in the currency report) on grounds of improper venue, arguing that the charged conduct has no connection with the District of Columbia, based as it is on a telephone conversation between Smith, who was in Maryland at the time, and O'Brien, at the Prudential–Bache office in New Hampshire. Appellant contends that mere preparation for the commission of a crime in Washington, D.C. would not satisfy the venue requirement.

Venue lies "in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a) (1988); *United States v. DeLoach*, 654 F.2d 763, 766–67 (D.C.Cir.1980) (applying this venue provision to a § 1001 prosecution), *cert. denied*, 450 U.S. 933, 101 S.Ct. 1395, 67 L.Ed.2d 366 (1981). Count III charges a scheme to circumvent the currency reporting requirements, of which the telephone call was only a component part. The government argues that the scheme alleged in Count III "continued" in the District when Nicely first received the cash on June 3 and then handed it to O'Brien here the next day, at which time Prudential–Bache's duty to file a currency report arose, and cites a closely analogous fact pattern in *United States v. Hernando Ospina*, 798 F.2d 1570, 1577 (11th Cir.1986) (upholding venue in district where cash was accumulated and transferred). *See also United States v. North*, 910 F.2d 843, 911–12 (D.C.Cir.1990) (per curiam) (venue for bribery charge lay in Washington, D.C. on strength of a single ambiguous conversation, even though more detailed conversations and actual receipt of

the bribe occurred elsewhere). Since the charge is broadly framed as a "scheme" in Count III, rather than something more particularized, venue was proper in the District of Columbia.

### 3. Search Warrant.

■ Upon defendants' motion to suppress, the district court held an evidentiary hearing to assess the legality of the search of Kelgre's Maryland offices, eventually denying the motion (even though it concluded that the underlying affidavit had failed to establish probable cause) because the officers executing it acted in reasonable reliance on its validity. On appeal, Smith argues that the search warrant was illegal on its face (for lack of sufficient specificity) and in its execution (characterizing the search as "exploratory rummaging" for any documents relating to any financial transactions). Smith singles out one particular item of the warrant (which covers "Records, including but not limited to: ... [ones] pertaining to the transfer of funds to off shore and domestic financial institutions") for its lack of specificity, arguing that this was an illegal general warrant. Furthermore, Smith contends that the seizure of files was indiscriminate, and that this "flagrant disregard" for the limitations in the warrant requires suppression of all the documents.

The district court did suppress some seized materials relating to SCT that did not reflect knowledge of the currency reporting requirements. Moreover, we think that this warrant was sufficiently particularized on its face. *See In re Search Warrant*, 572 F.2d 321, 323 (D.C.Cir.1977) (per curiam) (reversing a suppression order that was premised on the invalidity of a catchall item in a lengthy warrant allowing seizure of "[a]ny and all fruits, instrumentalities, and evidence (at this time unknown) of the crimes of conspiracy ... which facts recited in the accompanying affidavit make out"), *cert. denied*, 435 U.S. 925, 98 S.Ct. 1491, 55 L.Ed.2d 519 (1978). The itemization of documents subject to seizure in this warrant does not appear to be blatantly open-ended. In addition, the district court commented that the affidavit was quite detailed, and the court had before it evidence that the executing agents were fully briefed and read an attachment to the warrant specifying the items subject to seizure. As to the method of execution, both D.C. Circuit decisions relied on by Smith ultimately held that the searches in question (FBI raids on the Church of Scientology's D.C. headquarters) were valid. *See United States v. Heldt*, 668 F.2d 1238, 1259 (D.C. Cir.1981) (per curiam), *cert. denied*, 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 440 (1982); *In re Search Warrant*, 667 F.2d 117 (D.C.Cir.1981) (per curiam), *cert. denied*, 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 441 (1982). In light of the district court's findings here, the execution of the warrant did not appear to rise to the level of "flagrant disregard."

### 4. IRS Sting Operation.

■ The district court expressed some concern about government misconduct in the IRS sting and left the question open by dismissing the motion without prejudice before trial. *See* Mem. Op. at 5–6. Nicely contends that Agent Wallace's conduct in first dangling out enormous sums of money to a poor businessman, and then later making veiled threats of physical harm when the transfer was delayed, was so outrageous that due process requires that he not be subject to prosecution. Even if we give appellant the benefit of all doubt, the cases line up squarely against him.

Both of this court's recent decisions on outrageous government conduct grew out of Abscam, and both rejected similar due process challenges. *See United States v. Jenrette*, 744 F.2d 817 (D.C.Cir.1984), *cert. denied*, 471 U.S. 1099, 105 S.Ct. 2321, 85 L.Ed.2d 840 (1985); *United States v. Kelly*, 707 F.2d 1460 (D.C.Cir.) (per curiam), *cert. denied*, 464 U.S. 908, 104 S.Ct. 264, 78 L.Ed.2d 247 (1983). The court observed in *Kelly* that only a "rare instance" of police overinvolvement ("physical or psychological coercion that 'shocks the conscience'") would violate due process. *See* 707 F.2d at 1476 & n. 13 (citation omitted). This simply is not one of those rare instances. *Cf. Jenrette*, 744 F.2d at 823–24 (rejecting due

process claims that defendant was targeted without reasonable suspicion, that the government repeatedly attempted to induce criminal behavior, and that a $100,000 bribe constituted compelling inducement).

Nicely tries to distinguish the Abscam decisions as involving corrupt public officials and not unreasonably large monetary inducements, erroneously quoting from sections of a concurring opinion that was not part of the per curiam court's opinion in *Kelly.* Even if a 5% fee on a $100,000 transaction would double Nicely's existing annual income (not to mention the substantial future amounts he could expect), that enticement alone would not necessarily qualify as coercive and outrageous conduct. *Cf. United States v. Emmert,* 829 F.2d 805, 811–12 (9th Cir.1987) (offer of $200,000 finder's fee "was not intended as bait for college students, but as a method to smoke out a supplier capable of selling large quantities of cocaine"). Nor do the agent's ambiguous threats seem to qualify as outrageous conduct. First, they hardly amount to duress, appearing instead to be perfectly consistent with what one would expect when large sums of money are not accounted for as promised in a murky transaction involving shady characters seeking to launder large sums of money. *See id.* (because threats are "ordinary bargaining tactics in drug deals, government agents may need to engage in such unsavory conduct to maintain their cover"); *United States v. Nixon,* 777 F.2d 958, 963–64 (5th Cir.1985). Secondly, because the threats did not arise until after most of the overt acts involving the currency reporting conspiracy were completed, they would provide no basis for overturning his conviction.

5. Treasury Affidavits.

Appellants' remaining objections involve challenges to evidentiary rulings and the resentencing orders. Since retrial is necessary in any event because of the misjoinder, we need not reach these objections. However, since the question may well recur at a new trial, it is useful to express our concern about the government's use of Treasury Department affidavits in this case to establish that no currency reform program was ever considered.

Negative public records have, of course, been used routinely in the past without raising Confrontation Clause problems. *See, e.g., United States v. Lee,* 589 F.2d 980, 988 (9th Cir.1979) (upholding introduction of affidavits prepared by three CIA officials stating that a search of their records failed to reveal any entries for the defendant), *cert. denied,* 444 U.S. 969, 100 S.Ct. 460, 62 L.Ed.2d 382 (1979). Moreover, recent Supreme Court decisions have further softened the Confrontation Clause's requirements of unavailability and reliability. *See Bourjailly v. United States,* 483 U.S. 171, 181–84, 107 S.Ct. 2775, 2781–83, 97 L.Ed.2d 144 (1987) (there is no violation when out-of-court statement is admitted under the co-conspirator hearsay exception).

The government argues that negative public records admissible under the hearsay exception in Federal Rule of Evidence 803(10) should be equally immune from constitutional challenge. Even so, we are somewhat troubled by the government's extensive use of affidavits in this case. Unlike routine searches of easily pinpointed data compilations that courts have upheld in the past, this case presents us with a situation where the affidavits were based on a far-ranging review of different Department files for any evidence that the government considered a currency reform proposal along the lines represented to SCT. Under these circumstances, especially absent any explanation from the government as to why it could not have easily called on these Treasury officials to testify in person, use of affidavits in lieu of Department officials who conducted the search may unjustifiably circumscribe defendants' confrontation rights. We think that the district court must carefully scrutinize any similar use of such evidence on retrial.

III. CONCLUSION

The government overreached in joining these two conspiracies in a single indictment. While reviewing courts can and do

indulge a presumption in favor of joinder to serve the interests of judicial economy, we cannot condone the government's sloppy assimilation of charges that have no logical relationship to one another and whose joinder infringes on defendants' constitutional rights to a fair trial. "Symbiosis" is no substitute for an articulable connection between otherwise disparate conspiracies. The convictions are therefore reversed, and the cases are remanded to the district court.

*It is so ordered.*