**UNITED STATES of America,
Plaintiff,**

v.

**Andrew Lee HOPKINS and Keisha
Wilson, Defendants.**

**No. CR. A. 00–20(RCL).**

United States District Court,
District of Columbia.

Nov. 22, 2000.

Steven N. Siegel, U.S. Department of Justice, Narcotics & Dangerous Drug Section, Washington, DC, for Plaintiff.

Valencia Rainey, Federal Public Defender's Office, Washington, DC, H. Heather Shaner, Washington, DC, for Defendants.

### MEMORANDUM OPINION
### AND ORDER

LAMBERTH, District Judge.

The defendants move the Court to suppress evidence seized during a search of their residence. They assert that the warrant on which the search was predicated was not supported by probable cause, and that officers executing the warrant did not possess a good faith belief in its validity. The defendants further move the Court for severance of their joint trial. The government counters each of these motions. After considering the parties' oral arguments, their memoranda of points and authorities, and for the following reasons, the Court hereby DENIES the defendants' suppression motions and further DENIES their motions to sever.

### BACKGROUND

On Friday, December 10, 1999, Mr. Hopkins, one of the defendants, was socializing with two of his friends in front of 317 51st Street, Northeast. Two police officers on routine patrol approached the three men on foot and noticed Mr. Hopkins making "furtive movement[s]" with his hand near his waistline. *See* Affidavit in Support of an Application for a Search Warrant ¶ 2. Upon seeing this, the officers ordered Hopkins to raise his hands away from his waist. At this order, Hopkins fled. One of the officers gave chase, eventually catching and tackling Hopkins. During the tackle, a .45 caliber semiautomatic pistol fell from Hopkins' pants, causing him to be arrested for, inter alia, carrying a pistol without a license.

Less than three days later, Investigator John Ashley sought a search warrant for Hopkins' residence. Mr. Ashley averred that the recent arrestee "may have at his home address ... additional guns, ammunition, gun care and cleaning materials, receipts for guns and related gun materials, reloading equipment, holsters and accessories." *Id.* at ¶ 7. Mr. Ashley seems to have based this conclusion on three grounds: his formal training, his on-the-job experience, and Hopkins' recent gun-related arrest.

Regarding his formal training, Mr. Ashley swore in his affidavit that:

The affiant has received related Narcotic and Drug Trafficking training in the Drug Enforcement Administration's Drug Investigators School, as well as the Maurice T. Turner Institute for Police Science. The affiant has been trained in enforcement of the D.C.Code, Uniform Controlled Substance Act and other related narcotics violations. The affiant has also received training in drugs, pharmacology, and related topics during certification and training as an Emergency Medical Technician in both the District of Columbia and the Commonwealth of Virginia.

*Id.* at ¶ 5.

Regarding his on-the-job experience, Mr. Ashley swore in his affidavit that:

The affiant has participated in over 150 narcotics related arrests and search warrants, as well as arrests for firearms and weapons violations within the District of Columbia. During my tenure with the Metropolitan Police Department, your affiant has learned the following:

A. That narcotic traffickers keep and store firearms, and all related accessories, ammunition, etc., within their premises to protect their narcotics and themselves.

B. That narcotic traffickers keep additional narcotics, cutting agents, scales, packaging material, and other instruments used to package narcotics in their homes.

C. That narcotic traffickers keep large sums of currency within their premises to maintain their narcotics trafficking operations as well as the fruits of their narcotics sales.

D. That narcotics traffickers maintain documents receipts, ledgers, tally sheets of sales, lists of clients, related

records, and bank documents recording transactions from their narcotic trafficking.

*Id.* at ¶ 5–6. Despite his extensive experience in narcotics enforcement, Mr. Ashley has relatively little experience in obtaining search warrants. He admitted during the November 15, 2000 hearing that this was the first application for a search warrant he had ever made.

Regarding Hopkins' gun-related arrest, Mr. Ashley's sworn statement is less straightforward. He *did not* aver that the arrest likely suggested a broader pattern of illegal gun use, but rather stated without any explanation that the defendant had previously been arrested:

> The affiant reports that within the past seventy-two hours, the resident of the described premises was arrested when he was found to be in possession of a semi-automatic handgun which he had concealed upon his person outside of his home. This is a violation of D.C.Code.

*Id.* at ¶ 1.

Based on this affidavit, Judge Mitchell of the District of Columbia Superior Court issued a search warrant for Hopkins' residence on December 13, 1999. The warrant permitted officers to search for "firearms, ammunition, [gun] accessories, . . . and related paperwork." The warrant was executed nine days later, at 1:15 PM on December 22, 1999. Hopkins and his friend, Keshia Wilson, were home at the time. During the search of the premises, the officers found, inter alia, (1) a .45 caliber handgun, (2) 53 plastic bags of crack cocaine, (3) 104 plastic bags of heroin, and (4) 1 large chunk of crack cocaine. Hopkins and Wilson are now before this Court facing an indictment based on this evidence. The Court now considers their motions to exclude this evidence, as well as their motions to sever.

### *ANALYSIS*

The defendants argue that the search warrant used to enter and search their residence was not supported by probable cause. Further, they argue that the officers executing the warrant should have known that the warrant was not supported by probable cause. These points together, argue the defendants, necessitate the exclusion of the evidence seized at their residence. Finally, the defendants argue that their joint trial should be split into two separate trials. The Court finds first that the warrant was not based on probable cause, and thus was invalid. The Court also finds, however, that the warrant was executed in good faith by the officers and that the evidence obtained during the search is therefore admissible. Finally, the Court finds that joinder is proper.

### I. The Probable Cause Determination

#### A. Standard of Review

 In reviewing a magistrate's issuance of a search warrant, a court must inquire whether the magistrate had a "substantial basis for determining the existence of probable cause." *Illinois v. Gates,* 462 U.S. 213, 239, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *U.S. v. Warren,* 42 F.3d 647, 652 (D.C.Cir.1994). Because there is a strong preference that Fourth Amendment searches be conducted pursuant to a warrant, *see United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), reviewing courts should avoid a "grudging or negative attitude . . . towards warrants." *Gates,* 462 U.S. at 236, 103 S.Ct. 2317. Yet, a district court must be leery that a magistrate might be unwittingly serving as a "rubber stamp for the police" by ratifying "the bare bones conclusions of others." *Id.* at 239, 103 S.Ct. 2317. All in all though, a magistrate's "determination of probable cause should be paid great deference by reviewing courts." *Id.* at 236, 103 S.Ct. 2317.

#### B. Standard for Issuing a Search Warrant

The text of the Fourth Amendment requires that "no Warrants shall issue, but upon probable cause." U.S. Const. amend.

IV. As any warrant judge would likely attest, this provides little guidance during the many late-night warrant requests made by anxious officers. At the same time, however, one would be hard-pressed to improve the standard. Perhaps all that can be done to help magistrates is what the Supreme Court did in *Illinois v. Gates,* i.e., urge magistrates to use their common sense. In *Gates,* the Court instructed magistrates to "make [ ] practical, common-sense decision[s] [based on] all the circumstances set forth in the affidavit." *Gates,* 462 U.S. at 238, 103 S.Ct. 2317.

■ But this is not to say that a warrant decision is wholly the product of the judge's "hunch." Rather, some overt guideposts do exist to help judges organize their analysis. One of those guideposts is the nexus requirement, i.e. the requirement that there be "reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Zurcher v. Stanford Daily,* 436 U.S. 547, 556, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978). In other words, probable cause that a particular person possesses contraband is usually not, without more, enough to obtain a warrant to search the person's residence for that contraband. As the Fourth Circuit opined in *United States v. Lalor,* "residential searches have been upheld only where some information links the criminal activity to the defendant's residence." *United States v. Lalor,* 996 F.2d 1578, 1583 (4th Cir.1993).

■ This is not to say, however, that the information providing the link need be direct evidence or personal knowledge. Rather, the information can be anything that would provide "a reasonable basis to infer from the nature of illegal activity observed, that relevant evidence will be found in the residence." *United States v. Thomas,* 989 F.2d 1252, 1254 (D.C.Cir. 1993). Thus, in *United States v. Corral,* 970 F.2d 719, 728 (10th Cir.1992), the court found that a defendant's return to his residence after negotiating a drug price—but before delivering the drugs—provided a reasonable probability that the drugs were stored in the residence. Similarly, in *United States v. Feliz,* 182 F.3d 82 (1999) the First Circuit upheld a warrant to search a known drug dealer's residence even though there was no direct evidence that drug paraphernalia—such as client lists and accounting records—were stored at the home. The magistrate issued a warrant, and the court of appeals ultimately upheld the decision. The court recognized that it was reasonable to suppose that "a long-time, successful, drug trafficker" possessed at his home "documents showing the names and telephone numbers of customers and suppliers as well as accounts showing the monies paid and collected." *Id.* at 87.[1]

These two examples, in that they involve drug trafficking, are quite typical of the caselaw addressing reasonable inferences in the warrant context. As many sociologists would attest, the world of drugs has its own unique culture. And like any culture, it has its own distinctive artifacts and customs. For instance, dealers often have scales to measure their inventory, and users often have pipes to smoke their drugs. Similarly, dealers usually carry only a portion of their inventory with them at any one time, usually choosing to store most of their drugs someplace else, often their residence. Observing this cultural

---

1. For other cases recognizing the role of reasonable inferences in evaluating the nexus requirement, see, e.g., *United States v. McClellan,* 165 F.3d 535, 546 (7th Cir.1999) (holding that evidence that the defendant was a drug dealer was sufficient to establish probable cause for the search of his residence); *United States v. Thomas,* 989 F.2d 1252, 1254 (D.C.Cir.1993) (the "nature of the illegal activity" observed "away from the suspect's residence" can support a finding of probable cause if "there is a reasonable basis to infer ... that relevant evidence will be found at the residence."); *United States v. Williams,* 974 F.2d 480, 481–82 (4th Cir.1992); *United States v. Angulo–Lopez,* 791 F.2d 1394, 1399 (9th Cir.1986).

**6**

pattern, the Ninth Circuit observed that, "[i]n the case of drug dealers, evidence is likely to be found where the dealers live." *United States v. Terry*, 911 F.2d 272, 275 (9th Cir.1990). Few who have been in law enforcement over the past two decades would disagree. Of course, in any particular case, an inference based on the norms of the drug culture may turn out to be wrong. But that does not mean that, given our courts' repeated experience with the drug culture, that the inference was unreasonable.

Outside the distinctive drug culture, however, behavior is much less uniform and inferences are correspondingly tougher to draw. A common non-drug situation is the one considered by the Maryland Court of Appeals in *State v. Ward*, 350 Md. 372, 712 A.2d 534 (1998). In *Ward*, police were investigating the murder of an individual who was "shot a number of times and killed on a public street in Baltimore City." *Id.* at 374, 712 A.2d 534. Importantly, no murder weapon was found at the scene. The police began to suspect a man named Gary Ward and applied for a warrant to search his residence for "handguns, ammunition, [and] personal papers showing ownership/possession of a firearm". *Id.* at 376, 712 A.2d 534. In the affidavit supporting the warrant, the police stated that Mr. Ward had two or more handgun violations and was identified by a witness to be the murderer. As well, Mr. Ward apparently did not know that he was suspected of the murder. The magistrate issued the warrant, and the police found the murder weapon in Mr. Ward's home.

Maryland's highest court upheld the magistrate's finding of probable cause, opining that "the magistrate could infer that, between the murder and the application for the warrant, Ward had not disposed of the murder weapon and that ... [the weapon] could be found in Ward's home." *Id.* at 376, 712 A.2d 534. In reaching this conclusion, the court undertook a comprehensive review of gun related inferences made in the warrant context. The general position observed by the court, as well as commentator W.R. La-Fave, is that

> where the object of the search is a weapon used in a crime ... the inference that the items are at the offender's residence is especially compelling, at least in those cases where the perpetrator is unaware that the victim has been able to identify him to the police.

*Id.* at 380, 712 A.2d 534 (quoting W.R. LaFave, Search and Seizure § 3.7(d), at 384 (3d ed.1996)).[2]

Although one or two particular facts might be highly suggestive of probable cause, it is important to remember that the test for probable cause is not one that can be reduced to a checklist. For this reason, presumably, the First Circuit carefully limited its holding in *Feliz*, discussed above:

> [W]e do not suggest that, in all criminal cases [where a suspect has been accused of a crime], there will automatically be probable cause to search a suspect's residence. All factors must be weighed in each case in order to assess the reasonableness of inferring that evidence of a crime can be found at the suspects home.

*Feliz*, 182 F.3d at 88. This limitation is essential to the "rational inference" doc-

2. *See also United States v. Jones*, 994 F.2d 1051, 1056 (3d Cir.1993) (opining in dicta that firearms used in a robbery are "likely to be kept in a suspect's residence"); *United States v. Steeves*, 525 F.2d 33, 38 (8th Cir. 1975) (observing that, in the case of a bank robbery, there is "little reason to believe that any of the bank's money ... would still be in the home" but that "the same could not be said of the revolver"); *Bastida v. Henderson*, 487 F.2d 860, 861–62 (5th cir.1973) (affirming a magistrate's finding of probable cause to search a suspect's house for a gun used in a robbery of which he was suspected). *But see United States v. Charest*, 602 F.2d 1015, 1017 (1st Cir.1979) ("Common sense tells us that it is unlikely that a murderer would hide in his own home a gun used to shoot someone else.").

trine, because it reminds the magistrate that, in the end, there is no touchstone factor that can establish probable cause. To hold otherwise would be to overturn the "totality of the circumstances" test promulgated by the Supreme Court in *Illinois v. Gates.*

\* \* \* \* \* \*

Thus, a probable cause evaluation is a purposefully fluid analysis—one that depends on common sense, rational inferences, and logical connections. The Court now considers whether the magistrate in this case utilized these practices.

C. The Magistrate's Determination in the Instant Case

■ The starting place in evaluating the magistrate's decision is the text of the warrant itself. In this case, Judge Mitchell permitted officers to search for "firearms, ammunition, [gun] accessories, . . . and related paperwork." The next step is to determine whether the officer's affidavit properly supported this warrant.

Looking at Investigator Ashley's affidavit, one is initially struck by the number of references to narcotics. Investigator Ashley explained in his affidavit that he has received "Narcotics and Drug Trafficking" training from the "Drug Enforcement Administration," that he is trained in the enforcement of the "Uniform Controlled Substances Act," and that he has received "training in drugs, pharmacology, and related topics during certification as an Emergency Medical Technician." Mr. Ashley went on to explain the many inferences that, from his tenure with the Metropolitan Police Department, normally flow from one's status as a narcotics trafficker. Narcotics traffickers, says Mr. Ashley, "store firearms, . . . additional narcotics, . . . large sums of currency, . . . [and] records of their operations . . . at their premises." There is only one problem with all of this: Mr. Ashley offered no evidence that Hopkins was a drug trafficker or in any way involved in drugs. Indeed, Mr. Ashley admitted that, in retro-

spect, the plethora of drug references in his affidavit were superfluous, explaining that the information was likely included by mistake. *See* Transcript of Suppression Hearing, November 15, 2000.

Cutting away then all of this superfluous information, one is left with little more than "bare bones." *Gates,* 462 U.S. at 239, 103 S.Ct. 2317. The only references to firearms are the following: (1) Mr. Hopkins had been arrested on a firearms violation in the general proximity of his residence (1–3 blocks) less than seventy-two hours earlier, (2) Mr. Hopkins had been arrested on a firearms violation on August 28, 1998, (3) Mr. Ashley has participated in over 150 arrests and warrants for narcotics violations, but some unknown number of arrests for firearms and weapons violations. These three references fall far short of providing probable cause that Hopkins had firearms and related accessories in his residence.

In the Court's view, the most obvious shortcoming of the affidavit is that it fails to satisfy the nexus requirement discussed above. Given the affidavit and the resulting warrant, the inference made in this case amounted to the following: suspects who are arrested for gun violations twice in fifteen months have illegal guns and related accessories in their home. This is simply not enough to support a finding of probable cause.

This case is distinctly different from the drug trafficking cases where magistrates routinely infer that well-established dealers likely have drugs and related accessories in their homes. Unlike the drug culture, the incidence of gun possession is not so highly identified with a particular pattern of behavior. While drug dealers usually require a place to store their inventory, gun owners can (and often do) carry their entire artillery—often a single pistol—with them at any one time. People who have a gun rarely need to make repeated purchases of a gun, and rarely run a gun distribution network out of their

home. Of course, this could be true in any one case, but the affidavit in the instant case is devoid of any reconnaissance information that would lead one to think such circumstances were afoot. The affidavit might have, for example, explained that men who carry guns of the type Hopkins carried are usually connected with gun ·distribution rings and that such rings often have part of their inventory stored in the ring-members' residences; or that owners who possess guns like Hopkins' gun usually possess a collection of attachments and paraphernalia, and that these attachments are usually kept at that owners' residences. But the affidavit did none of this; and it is unreasonable for a magistrate to infer these or other similar circumstances from two gun arrests over a fifteen month period.

This case is also distinctly different from the many cases finding probable cause to search a suspect's residence for a gun. Those cases rest on the logical assumption that, when a gun is missing from the scene of a crime and the suspect to that crime is unaware that he is a target, it is likely that he would still possess the gun in a place where guns would normally be kept. This is not that case. In this case, the gun that was the source of Hopkins' arrest was confiscated at the scene of the arrest. Further, Hopkins knew, by virtue of his arrest, the police were aware of his possible connections with guns. These factors make it much less likely Hopkins would be secreting a gun at his residence.

Although the Court rejects the magistrate's decision, it should be noted that this is not likely a case where the magistrate was "asleep at the switch." The affidavit in this case was accidentally prepared with a mix of drug and gun references, a mix that—at least in this district—serves as the proper basis for warrants on a daily basis. While a careful reading should have revealed the irrelevance of the drug information, since there was nothing whatsoever to tie the defendant to drug trafficking, and the resulting paucity of the gun infor-

mation, such careful scrutiny is sometimes omitted in the innumerable exigencies that beset warrant judges. To be sure, this practice should never be omitted. But the failure to parse the affidavit as this court has done for several days is an error much smaller than erroneously finding probable cause based on two gun violations.

\*　　\*　　\*　　\*　　\*　　\*

Although the Court finds the search warrant to be invalid, the evidence obtained during the search will still be admissible if the officers executed the warrant in good faith. The Court now considers this issue.

## II.　The Warrant's Execution

### A.　*Leon* and the "Good Faith" Exception

The Fourth Amendment, standing alone, is not nearly the constitutional force it is thought to be. Although it protects one from "unreasonable searches and seizures," it fails to protect one from prosecution using the evidence obtained in such acts. This apparent disconnect was first bridged in *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). In *Mapp*, the Supreme Court reasoned that one's Fourth Amendment right to privacy would be rendered quite hollow unless a violation thereof was sufficiently punished. Sufficient punishment, the Court concluded, required evidence obtained in violation of one's Fourth Amendment rights to be excluded from the prosecution's case. Thus was born the exclusionary rule.

But a rule born of incentives must also die with them. Such was the circumstance in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). In *Leon*, several law enforcement officers sought to search the residence of suspected drug traffickers. The officers followed the prescribed procedures, submitting an affidavit to a magistrate and obtaining a search warrant. When the suspects were later prosecuted using the fruits of the search, they moved to exclude the evi-

dence—arguing that the warrant was not supported by probable cause. The Supreme Court ruled that the evidence was admissible, even if the magistrate mistakenly issued the warrant.

The Court's decision was based on an explicit cost-benefit analysis. According to the Court, the "marginal or non-existent benefits" of excluding the evidence were greatly outweighed by the societal costs of permitting "some guilty defendants [to] go free." *Id.* at 907, 104 S.Ct. 3405. In the Court's view, the benefits of exclusion—namely deterring overreaching police conduct—would be extremely slight in this case because there was no evidence that the police were overreaching at all. Rather, the defendants' rights were violated by a mistake on the part of the magistrate. And magistrates, as long as they remain neutral and detached, would have no reason to alter their conduct if evidence obtained pursuant to their warrants were excluded.

■ The sensibility of this rule depends on two key factors: the neutrality of the magistrate and the absence of police overreaching. Accordingly, the Court made the *Leon* exception inapplicable in several circumstances. For the purposes of the instant case, one particular circumstance is relevant, namely where "the warrant [was] based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." [3] *Id.* at 923, 104 S.Ct. 3405. The *Leon* Court recognized that, although mistakes in a probable cause determina-

tion are chiefly attributable to the magistrate, an officer who himself knows probable cause is lacking cannot take advantage of a magistrate's obvious mistake. But this leaves one final question: How obvious must a mistake be?

■ According to the Court in *Leon*, a mistake is obvious if "a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Id.* at 922 n. 23, 104 S.Ct. 3405. Courts reviewing an officer's decision should assume the officer has "a reasonable knowledge of what the law prohibits" and take into account "all of the circumstances—including whether the warrant application had been previously rejected by a different magistrate." *Id.* at 919 n. 20, 104 S.Ct. 3405; *id.* at 922 n. 23, 104 S.Ct. 3405.

### B. The Execution of Investigator Ashley's Warrant

■ Looking at all the circumstances in the instant case, the Court finds that the warrant, even if unsupported by probable cause, was executed in good faith by the law enforcement officers. Thus, the exclusionary rule is not triggered and the physical evidence obtained at the defendants' residence is admissible.

In executing the warrant, the officers made an assumption. They assumed that one who has a past of carrying guns, and has just recently carried a gun near his home is likely to have gun paraphernalia in his home. As the Court explained above,

3. The other circumstances where the *Leon* exception is inapplicable are (1) where the "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth," (2) where the magistrate "wholly abandoned his judicial role," and (3) where the warrant itself was "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers [could not] reasonably [have] presume[d] it to be valid." *Leon*, 468 U.S. at 923, 104 S.Ct. 3405.

Of these three circumstances, only circumstance (1) could be implicated by the facts of this case. It might be argued that, by including the irrelevant narcotics information in the affidavit, Investigator Ashley "misled" the magistrate. However, there is no evidence that Ashley included the information with the intent to mislead, or that the inclusion amounted to a "reckless disregard of the truth." Accordingly, the Court finds that the evidence obtained in the search is not rendered inadmissible on this ground, or any other of the above grounds.

this is not enough to establish probable cause. But it is enough to show that the officers were acting in good faith. Their conclusion was not illogical, just weakly supported. Law enforcement officers in areas such as the District of Columbia are no doubt familiar with many individuals who, after several arrests, continue to violate the law. It is not absurd to think that the defendant in this case might be one of those people. Thus, although the officers may have acted prematurely or even somewhat overzealously, the court cannot say that they acted in an "entirely unreasonable" manner. *Leon,* 468 U.S. at 923, 104 S.Ct. 3405.

This decision is further bolstered by the fact there is not even a hint of evidence that the officers were acting surreptitiously. There is no evidence that the drug references in the affidavit were included in an effort to confuse or mislead the magistrate. Further, Investigator Ashley followed the appropriate procedures in having an assistant U.S. Attorney endorse the affidavit. To be sure, if there was a hint of skullduggery in the record, the Court would almost summarily exclude the evidence. But this does not appear to be such a case, and therefore the Court finds the evidence admissible.

### III. Joinder and Severance

The defendants argue that they have been improperly joined in the instant case, and that even if joinder was appropriate, several factors justify severance. The Court disagrees and accordingly denies the defendants' motions to sever.

#### A. Grounds for Joinder and Severance

 Regarding joinder, Federal Rule of Criminal Procedure 8(b) permits defendants to be joined if "they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Fed.R.Crim.P. 8(b). Under the law of this circuit, several acts or transactions constitute a "series" if there is "a

logical relationship between the acts or transactions." *United States v. Nicely,* 922 F.2d 850, 853 (D.C.Cir.1991) (quoting *United States v. Perry,* 731 F.2d 985, 990 (D.C.Cir.1984)); *see also United States v. Spriggs,* 102 F.3d 1245, 1255 (D.C.Cir. 1996). Additionally, "[w]here virtually all the evidence adduced at trial concerns a common course of conduct during the transaction or event, . . . severance need not be granted." *United States v. Gibbs,* 904 F.2d 52, 56 (D.C.Cir.1990)

Regarding severance, Federal Rule of Criminal Procedure 14 permits a trial court to grant severance if "it appears that a defendant . . . is prejudiced by a joinder of . . . defendants." Fed.R.Crim.P. 14. According to the Supreme Court, prejudice exists if there is a "serious risk that a joint trial would compromise the specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States,* 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). Likely examples of prejudice include situations where key exculpatory evidence available to a defendant if tried alone would be somehow unavailable in a joint trial; situations where defendants with varying degrees of culpability are tried together in a complex case; and situations where evidence which is highly suggestive of one defendant's guilt is inadmissible against that defendant, but nonetheless admissible against a co-defendant. *Id.*

 Evidence that tends to inculpate a defendant even though it is not admissible against that defendant must be significant in its probative value to warrant a severance. To wit, this Circuit has stated that, "[a]bsent a dramatic disparity of evidence, any prejudice caused by joinder is best dealt with by instructions to the jury to be given individual consideration to the defendant." *United States v. Bruner,* 657 F.2d 1278, 1290 (D.C.Cir.1981); *see also United States v. Long,* 905 F.2d 1572, 1581 (D.C.Cir.1990).

### B. Joinder and Severance in the Instant Case

There is little argument in this case that the defendants are misjoined. They were arrested at the same time, in the same house, and are being prosecuted with evidence found in the same room. The separate crimes with which they are charged together constitute a series, which permits joinder under the clear text of Rule 8(b). Thus, the motion seeking to rectify misjoinder is denied.

Regarding severance, the argument is equally weak. There is very little evidence that joinder is so prejudicial that a severance is necessary. The defendants have proffered no exculpatory evidence that is somehow made unavailable to either of them in a joint trial. As well, this case is far from complex, and even if it were, the likely levels of culpability are quite similar. Moreover, the defendants' defenses, inasmuch as they have been evinced thus far, fail to conflict in any significant way with each other. Although Mr. Hopkins did make a statement inculpating Ms. Wilson, the prosecution has agreed to significantly curtail the use, if any, of this statement.[4] Finally, the court is confident that any minor prejudice that arises at trial can be adequately redressed with instructions to the jury. Accordingly, the motion for severance is denied.

### CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that Hopkins motion to suppress evidence [37–1] is DENIED; further it is

ORDERED that Hopkins motion to sever [37–1] is DENIED, further, it is

ORDERED that Wilson's motion to suppress evidence [21–1] is DENIED, further, it is

ORDERED that Wilson's motion to sever [19–1] is DENIED.

SO ORDERED.

---

4. The prosecution has, however, reserved the right to use the statement in its case in chief against Hopkins, and against Wilson on cross examination should she decide to take the stand. Although these circumstances do present the possibility of prejudice, they fall far short of demanding severance at this point. Of course, as the trial approaches, and the parties strategies become more clear, the Court is confident that it can address any unacceptable prejudice that may arise in connection with this issue.